# Illinois Official Reports

## Appellate Court

---

### *People v. Gomez*, 2020 IL App (1st) 173016

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE GOMEZ, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-3016 |
| Filed<br>Rehearing denied | September 11, 2020<br>October 6, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-12661(01); the Hon. Steven J. Goebel, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Joshua M. Bernstein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Connors concurred in the judgment and opinion.<br>Presiding Justice Mikva dissented, with opinion. |

**OPINION**

¶ 1        Defendant, George Gomez, appeals the judgment of the circuit court denying his motion for leave to file a successive postconviction petition. On appeal, defendant contends that he should have been granted leave to file where his successive petition and supporting documents established cause and prejudice on the issue of whether his *de facto* life sentence, for an offense he committed when he was 18 years old, violated the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), as applied to him. For the following reasons, we affirm.

¶ 2                                              I. JURISDICTION

¶ 3        The circuit court denied defendant's motion on September 6, 2017. He filed his notice of appeal on October 4, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                                              II. BACKGROUND

¶ 5        The following are facts relevant to this appeal. Defendant and codefendant, Misael Juarez, were tried separately for the murder of Ivan Sanchez. On September 19, 2004, Ivan and his girlfriend, Michelle Davila, sat in his car eating food from Wendy's. His car was parked next to an alley across the street from his home, near a car dealership. Ivan was eating his sandwich when he stopped abruptly and tried to turn the ignition to start his car. When Davila asked what was wrong and he did not answer, she looked through the rear driver's-side door window and saw a man wearing a white handkerchief, "creeping up on us." Although the lower part of his face was covered, Davila could see his eyes. She stated that the man held a gun, more of a semi-automatic weapon than a revolver. Ivan began pleading for his life, stating that they had the wrong person and he was not in a gang. The man responded, "something killer," stepped back, and fired at least six times through the driver's-side window. Davila jumped out of the car and fell to the ground. She saw the man run toward Ivan's house and the alley. She identified defendant as that man.

¶ 6        Davila picked defendant's photo out of an array of 35 photos of Hispanic men showing the lower part of their faces covered. Later, she went to the police station and viewed a lineup of four men, with their noses and the lower parts of their faces covered. Davila identified defendant as the person who shot Ivan. She recognized the eyes because she got a good look at the shooter's eyes.

¶ 7        On cross-examination, Davila acknowledged that on the night of the shooting, she had "smoked a blunt" approximately 45 minutes to an hour before the incident. However, she testified that she was not high at the time because she had eaten some food and, with the adrenaline she felt at the time, any high would be gone. Davila also acknowledged that after she rolled out of the car, she could still hear shots being fired but she could not see the person who was firing at that point. When questioned whether she was 100% sure of her identification of defendant as the shooter, Davila answered that she was "ninety percent sure." When defense

counsel asked whether "there is a little bit of doubt there," Davila responded, "There's always doubt."

¶ 8    Luis Santa testified with help from a sign language interpreter. He testified that on September 19, 2004, shortly before 11 p.m., he was walking on Cicero Avenue when a red Probe stopped alongside of him. There were two individuals in the car, and neither wore anything over their faces. One of the men got out of the car and said "Styler killer" to Santa. Santa understood that to be a gang-related reference. The man said, "Disciple killer" and "Styler killer" again, and Santa waved his hands to indicate "no no." The driver told the man to leave Santa alone because he was "crazy." Santa testified that the man had a gun in his waistband, but he never took out the gun. The interaction lasted approximately three minutes. Santa identified defendant in court as the man who approached him.

¶ 9    After the car left, Santa continued to walk north on Cicero to his mother's house. Around 11:20 p.m., he saw the same red car driven by the same driver he had seen earlier. He was scared that the man would come back to hurt him, so he watched from a used car lot across the street. He saw a man walk to the driver's side of a dark blue parked car. The man said something to the driver of that car and then fired his gun five times. At the time, the shooter had a white handkerchief covering his face below his eyes. Santa saw a woman get out of the car and try to hide under the car.

¶ 10   Santa ran away after the shooting because he was scared. A few days later he told a friend what he had seen. On April 18, 2006, the police came to his mother's house to talk to him, but Santa ran away because he was scared. The police caught him about a block away. Santa viewed a photo array and identified the driver and the shooter. He identified defendant as the shooter.

¶ 11   Defendant was 18 years old at the time of the shooting. He was interviewed at the police station. After being advised of his *Miranda* rights, defendant admitted his involvement in the incident. Defendant stated that he was driving a red Ford Probe, his mother's car, on the night of the shooting. Defendant knew Juarez had a gun when he dropped him off in the alley. Juarez told him that he was going to "check somebody," meaning he was going to see if anyone in the area was in a gang. Defendant acknowledged that if Juarez found a person from a rival gang, he would shoot that person. Defendant turned up his music and watched Juarez run in front of him before he left "to meet somebody." Later, he picked up Juarez in the middle of the block.

¶ 12   Although defendant acknowledged that the shooting of gangbangers is "how it goes on the streets," he stated that he did not know Juarez would shoot anyone. When Juarez got back into the car, he told defendant that he shot someone. Defendant stated that he was only driving the car and at no time did he possess a weapon or fire a weapon. He also denied that he gave the gun to Juarez.

¶ 13   After closing argument, the trial court found defendant guilty of first degree murder on a theory of accountability. The court found the State's witnesses credible, as well as Santa's identification of defendant as the man with the gun who talked to and threatened him. However, the court "was not quite sure about" the witnesses' identification of the shooter, in light of defendant's "adamant" statement that he was the driver, not the shooter. The trial court noted that although Davila was 90 percent sure of the shooter's identity, "she did say there's always doubt." Santa "was a ways away. I'm not completely sure, he could have had assumed it was the defendant from seeing him earlier with the gun and just assumed it was him, or it could

have been the codefendant. He was a ways away." What the trial court did not doubt was that defendant "participated in the murder of Ivan Sanchez."

¶ 14 Defendant filed a motion for a new trial. At the hearing, defense counsel argued that the witnesses' identifications were not reliable. Counsel pointed out that although there was artificial lighting in the area, it was late at night. Santa observed the shooting from across the street, in the parking lot of a used car dealership. Also, from Santa's vantage point, his view would have been "somewhat blocked" by cars parked on the street. Counsel argued that Davila got out of the car and fell to the ground soon after she heard shots. The only thing she saw was someone running away after the shooting. Given that defendant never admitted to having a gun on the night of the shooting, and no forensic evidence tied defendant to the shooting, counsel argued that the State had not met its burden of proving defendant guilty beyond a reasonable doubt.

¶ 15 The trial court denied the motion, finding that Santa

"ID'd the defendant with the gun and that the two Defendants were acting part and parcel and completely together, and combining that with your client's statement, there is no question in this Court's mind that he is absolutely positively 100 percent accountable for the murder of the victim in this case."

¶ 16 At the sentencing hearing, the trial court heard evidence in mitigation and aggravation. In mitigation, defense counsel pointed to the presentence investigation report (PSI), which showed that defendant had no prior criminal convictions. While in custody, defendant attended school and performed well. He had a work history as a factory worker and at a McDonald's. Defendant's older brother, Roberto Gomez, testified that they both belonged to the Sureño 13 gang, but he was not sure whether defendant was in the gang on the night of the shooting.

¶ 17 After hearing arguments, the trial court found that "this is not a case that should be given the minimum." The court believed that defendant was in a gang, and he and Juarez were hunting for rival gang members. They "planned to shoot a rival gang member." They would have shot Santa when they encountered him, but because of his disability they let him go. The court stated that defendant had "been given certain opportunities" and appears to come from "a nice family," who support him and "testified well on [his] behalf." Although defendant lacked a criminal background, he "made a big jump" from "not having any background to murder." The court did not find "this case to be brutal and heinous under the law…This case is cruel and cold-blooded *** but I don't think it to be shockingly stupid." The court determined that "an appropriate sentence based on the hunting down of this victim and the fact that he was totally innocent and did say, 'Don't shoot,' is 35 years on the murder charge, plus an extra 15 pursuant to the applicable statute, 730 ILCS 5/5-8-1(a)(1)(d)(i)." The trial court suggested that while in prison, defendant should take advantage of "mentoring programs" and "bettering yourself in other ways," because "you do have some potential." The court stated that "what is sad about this whole thing is that you were and are a capable person, and you chose to do something so cruel, stupid, and vicious, to just gun down another unarmed person over gangs."

¶ 18 On direct appeal, defendant challenged only his sentence, arguing that it was excessive. This court found that defendant forfeited his challenge because he failed to file a motion to reconsider his sentence. See *People v. Gomez*, 2011 IL App (1st) 093007-U. This court further found that defendant's challenge would fail on the merits because "[t]he sentencing court clearly stated that it considered defendant's 'potential,' his lack of previous criminal history,

and each of the mitigating factors argued by counsel and set forth in the sentencing statute, before it imposed a sentence within the authorized statutory range." *Id.* ¶ 12.

¶ 19     On July 11, 2013, defendant filed a *pro se* postconviction petition alleging violations of his constitutional rights, including ineffective assistance of trial and appellate counsels. The trial court dismissed the petition as frivolous and patently without merit, and this court affirmed the dismissal on appeal. See *People v. Gomez*, 2015 IL App (1st) 140740-U.

¶ 20     On July 21, 2017, defendant filed an "expedited" motion for leave to file a successive postconviction petition. Defendant argued that in light of the United States Supreme Court case of *Miller v. Alabama*, 567 U.S. 460 (2012), and recent Illinois cases, his 50-year sentence is unconstitutional because it is a *de facto* life sentence imposed without the required consideration of the characteristics of his youth. Defendant was 18 years old when the shooting occurred. Defendant cited studies showing that the part of the brain responsible for decision-making, inhibition, emotion control, and understanding the consequences of one's actions is still developing until a person is in his or her mid-twenties. He alleged that his immature brain caused him to engage in "impulsive, thoughtless and impetuous behavior at the time of his crime" and that he was more susceptible to external influences like peer pressure. Defendant stated that his immature brain was also more affected by his living situation. His father was addicted to alcohol and cocaine, "and the first gunshots heard came from his father's gun." His father also physically abused his mother, beating her in front of the children. His mother took out her frustrations and anger on her children "by hitting them, scream[ing] at them, and on several occasions not even feed[ing]" them.

¶ 21     The trial court found, however, that *Miller* is inapplicable to defendant's case because he was 18 years old when the shooting occurred and he did not receive a mandatory life sentence. The court also found that the sentencing court considered defendant's youth and potential rehabilitation, pointing to the sentencing hearing that "spans over 47 pages of the record." The trial court determined that defendant "failed to satisfy the cause and prejudice test necessary to raise his claims in a successive petition for post-conviction relief." Defendant filed this appeal.

¶ 22                                   III. ANALYSIS

¶ 23     The Post-Conviction Hearing Act (Act) provides a procedural mechanism through which defendant may assert violations of his constitutional rights in his original trial or at sentencing. 725 ILCS 5/122-1(a) (West 2016). Postconviction proceedings are collateral to proceedings on direct appeal, "and focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25. Since the Act contemplates the filing of a single petition, any claim not raised in the initial or amended petition is waived. 725 ILCS 5/122-3 (West 2016). Successive postconviction petitions are allowed only "when fundamental fairness so requires." *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002).

¶ 24     Leave of court to file a successive postconviction petition may be granted if defendant shows cause for failure to raise the claim in the initial postconviction proceeding and prejudice resulting therefrom. 725 ILCS 5/122-1 (West 2016); *People v. Wrice*, 2012 IL 111860, ¶ 48. To establish cause, defendant must point to some objective, external factor that impeded his ability to raise his claim in the initial postconviction proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. Prejudice is shown if the failure to raise the claim earlier "so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* at 464. The State's brief

challenges only whether defendant has shown prejudice; therefore, we address only that element of the analysis. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 25 Defendant was convicted of first degree murder on a theory of accountability. He argues that although he was 18 years old when he committed the offense, he was entitled to *Miller*'s protections because studies have shown that his brain, like those of juvenile defendants, is still developing in areas relevant to maturity and moral culpability. Defendant contends that his *de facto* life sentence of 50 years' imprisonment is unconstitutional as applied to him because the trial court did not fully consider the characteristics of youth, or his personal culpability, before sentencing him. Since defendant challenges his sentence under the eighth amendment and the Illinois proportionate penalties clause, we must determine whether he has shown prejudice as to each of these constitutional provisions. *Pitsonbarger*, 205 Ill. 2d at 462 (finding that "the cause-and-prejudice test must be applied to individual claims, not to the petition as a whole").

¶ 26 *Miller* recognized that children lack maturity, have an underdeveloped sense of responsibility, are more vulnerable to negative influences, and have character that is not yet well formed. *Miller*, 567 U.S. at 471. Not only do these characteristics diminish a child's culpability, but the "distinctive attributes of youth diminish the penological justifications" for imposing life without parole upon children. *Id.* at 472. Thus, "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the eighth amendment because such a scheme, by making the factors of youth "irrelevant to imposition of that harshest prison sentence *** poses too great a risk of disproportionate punishment." *Id.* at 479. To minimize this risk, *Miller* required that before sentencing a juvenile defendant to life in prison without parole, the court must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

¶ 27 In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016), the Court elaborated that the sentencing of a juvenile to life without parole is "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity' " of youth rather than "irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Therefore, the judge at a sentencing hearing must consider " 'youth and its attendant characteristics' " so that juveniles who may be sentenced to life without parole can be separated from those who may not. *Id.* at ___, 136 S. Ct. at 735.

¶ 28 In *People v. Harris*, 2018 IL 121932, ¶ 54, our supreme court rejected the defendant's claim that *Miller*'s eighth amendment protections should extend to young adults 18 to 21 years of age. Our supreme court recognized that the *Miller* line of cases "defined juveniles as individuals under the age of 18," and "the Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Id.* ¶¶ 56, 58. Our supreme court understood that drawing the line at 18 years old "was not based primarily on scientific research," but instead reflected an imprecise categorical rule that society followed in order to distinguish between children and adults for various purposes. *Id.* ¶ 60.

Accordingly, since defendant was 18 years old when he committed his offense, *Miller* does not apply directly to him, and we affirm the trial court's denial of leave to file a successive postconviction petition on this basis.

¶ 29		In his proportionate penalties claim, defendant seeks to extend the protections of *Miller* to himself as an 18-year-old young adult. The proportionate penalties clause of the Illinois constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. While the proportionate penalties clause has some relation to the eighth amendment, "that relationship is not entirely clear." *People v. Clemons*, 2012 IL 107821, ¶ 40. There is no question, however, that its focus on the objective of rehabilitation goes beyond the original intent of the eighth amendment "and is not synonymous with that provision." *Id.* For purposes of defendant's appeal, we presume that that the failure of his eighth amendment claim does not automatically defeat his proportionate penalties claim. See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶¶ 51-54 (recognizing that cases have not been clear on the extent to which the proportionate penalties clause is coextensive with the eighth amendment).

¶ 30		A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). Our supreme court has never defined what constitutes a cruel or degrading sentence that is "wholly disproportionate to the offense" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. To determine whether a sentence shocks the moral sense of the community, a reviewing court considers the objective facts of the case in light of "the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 31		Defendant was sentenced to 50 years in prison, which is a *de facto* life sentence. *People v. Coty*, 2020 IL 123972, ¶ 47. He contends that the reasoning in *Miller* and *Montgomery* apply to him because a significant risk of disproportionate punishment exists for 18-to-21-year-old defendants who receive a life sentence. Defendant cites articles discussing how the brain does not fully mature until a person reaches his or her mid-twenties. As a result, young adults are more similar to adolescents in significant ways, such as being more susceptible to peer pressure, and being more impulsive and less future-oriented. See Vincent Schiraldi & Bruce Western, *Why 21 Year-Old Offenders Should Be Tried in Family Court*, Wash. Post (Oct. 2, 2015), https://www.washingtonpost.com/opinions/time-to-raise-the-juvenile-age-limit/2015/10/02/948e317c-6862-11e5-9ef3-fde182507eac_story.html [https://perma.cc/U7ZS-N8BG]; see also Andrew Michaels, *A Decent Proposal: Exempting Eighteen-to-Twenty-Year-Olds From the Death Penalty*, 40 N.Y.U. Rev. L. & Soc. Change 139, 144, 161-179 (2016) ("evolving standards of decency—shaped by the modern cultural norm of extended adolescence and informed by scientific insights into the neurology and psychology of young adults—now ought to spare eighteen-to-twenty-year-olds as well").

¶ 32		There is some support for defendant's position from the legislature, which is the institution "better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *People v. Buffer*, 2019 IL 122327, ¶ 35. Recently, our legislature enacted section 5-4.5-115 of the Unified Code of Corrections (Code), which provides that defendants who were under the age of 21 when they committed the offense of first degree murder and sentenced on or after June 1, 2019, "shall be eligible for parole review *** after serving 20 years or more"

of their sentence. Pub. Act 101-288 (eff. Jan. 1, 2020) (recodifying 730 ILCS 5/5-4.5-110 as 730 ILCS 5/5-4.5-115). Furthermore, "[i]n considering the factors affecting the release determination ***, the Prisoner Review Board panel shall consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." Pub. Act 101-288 (eff. Jan. 1, 2020).

¶ 33     Notably, section 5-4.5-115 does not apply to those offenders "subject to a term of natural life imprisonment under Section 5-8-1 of this Code." *Id.* Our legislature clearly believed that a sentence of natural life in prison is appropriate for young adult defendants in certain circumstances. The Code also makes an important distinction between juvenile defendants and young adult defendants on the issue of sentencing. While the sentencing court must consider additional mitigating factors in determining the appropriate sentence for a juvenile defendant, incorporating *Miller* (see 730 ILCS 5/5-4.5-105(a) (West 2016)), there is no corresponding requirement for sentencing young adult defendants under 21 years of age, even to a term of life in prison with no possibility of parole. Section 5-4.5-115 recognizes that young adults under the age of 21 may be less morally culpable than a fully mature adult, thus entitling them to parole review after serving 20 years of a lengthy sentence. However, nothing in the Code equates young adult defendants with juveniles when it comes to sentencing them on their convictions.

¶ 34     Also, defendant's sentence for first degree murder on a theory of accountability does not, on its own, raise proportionality concerns. Courts have upheld the constitutionality of mandatory life sentences where the underlying conviction was based on a theory of accountability. *People v. McCoy*, 337 Ill. App. 3d 518, 523-24 (2003); *People v. Griffin*, 368 Ill. App. 3d 369, 379-80 (2006). Defendant argues, however, that his immature brain puts him in the category of a juvenile and for a juvenile, the characteristics of youth are relevant to the proportionality analysis.

¶ 35     In *Leon Miller*, the 15-year-old defendant had one minute to contemplate whether to participate in a crime and then acted only as a lookout during a shooting in which two people died. He never handled a gun during the incident. *Leon Miller*, 202 Ill. 2d at 341. Due to the convergence of three statutes, the juvenile defendant was tried as if he were the adult shooter, and he should have received a mandatory sentence of natural life imprisonment. *Id.* at 340. Our supreme court agreed with the trial court that a sentence of life in prison without the possibility of parole for the juvenile defendant, who was convicted on a theory of accountability, shocks the moral sense of the community. *Id.* at 341. The court noted our state's "long-standing distinction" between adult and juvenile defendants, based on the still-developing characteristics of juveniles and their greater rehabilitative potential. *Id.* at 341-42. The court found that the mandated sentence of natural life in prison without parole "implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life." *Id.* at 342-43. For the 15-year-old defendant, such a sentence "grossly distorts the factual realities of the case and does not accurately represent [his] personal culpability." *Id.* at 341.

¶ 36     Significant to our case, the decision in *Leon Miller* "does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate." *Id.* Our supreme court found it "possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two

or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Id.*

¶ 37 Here, defendant was an active participant in the plan to shoot rival gang members. Although the trial court did not have sufficient evidence to find that defendant was the shooter, it did find that defendant had a gun earlier that night and that he threatened Santa. The court believed that if Santa had not been disabled, he would have been shot. The court determined "that the two Defendants were acting part and parcel and completely together," and "there is no question *** that [defendant] is absolutely positively 100 percent accountable for the murder of the victim in this case." The trial court found that "this is not a case that should be given the minimum" because defendant and Juarez were looking for gang members and "planned to shoot a rival gang member." The court found the case "cruel and cold-blooded" based on the fact that defendant and codefendant hunted down the victim and "that [the victim] was totally innocent and did say, 'Don't shoot.' " Unlike the juvenile defendant in *Leon Miller*, defendant participated in the plan that led to the shooting of Sanchez. The case relied on by defendant as support, *People v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020), is distinguishable for the same reason.

¶ 38 Where an 18-year-old defendant actively participated in the crime, and the victim is purposely hunted and killed as the trial court found, a sentence of 50 years in prison is not cruel, degrading, or wholly disproportionate to the offense that it shocks the moral sense of the community. Defendant did not receive a mandatory sentence of natural life in prison in which the court could not consider the facts of the case or defendant's personal culpability. Instead, the trial court imposed a discretionary sentence, taking into account mitigating factors such as defendant's youth, background, and potential for rehabilitation. While the trial court found that defendant had "some potential" and suggested that he take advantage of "mentoring programs" and "bettering yourself in other ways," under the proportionate penalties clause, "the possibility of rehabilitation is not given greater weight or consideration than the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). Since defendant has not shown prejudice regarding his proportionate penalties claim, we affirm the trial court's denial of leave to file a successive postconviction petition on this basis as well.

¶ 39 Citing *Harris*, 2018 IL 121932, defendant argues that, at the very least, we should allow him to file his successive petition and have an evidentiary hearing so that findings of fact can be made on his claim. In *Harris*, the 18-year-old defendant argued for the first time on appeal that his sentence of 76 years' imprisonment was unconstitutional under the proportionate penalties clause as applied to him. *Id.* ¶ 35. Like defendant here, the defendant argued that as a young adult, the rationale in *Miller* should be extended to him. *Id.* ¶ 37. Our supreme court found that since the defendant raised his claim for the first time on appeal, no evidentiary hearing was held "and the trial court did not make any findings of fact on defendant's specific circumstances." *Id.* ¶ 40. Because *Miller* does not apply directly to an 18-year-old defendant, "[t]he record must be developed sufficiently to address defendant's claim that *Miller* applies to his particular circumstances." *Id.* ¶ 45. The court, however, declined to remand the case for an evidentiary hearing, finding that the appropriate procedure would be to file a petition seeking relief under the Act or under 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)).

¶ 40 *Harris* only determined that the defendant could file a postconviction petition raising his proportionate penalties claim; it never held that the defendant was entitled to an evidentiary

hearing upon filing the petition. Here, defendant sought leave to file a successive postconviction petition, and he must satisfy the cause and prejudice test before he may file it. Since he has not shown cause and prejudice, leave to file the successive petition was properly denied.

¶ 41 Due to our disposition of defendant's appeal, we need not consider the State's argument that in order for defendant to succeed on his *Miller*-based proportionate penalties claim, he must show he "*actually* ha[s] or had the brain developmental characteristic of minors" as required by *People v. Thompson*, 2015 IL 118151, and *Harris*, 2018 IL 121932.

¶ 42                                    IV. CONCLUSION
¶ 43 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 44 Affirmed.

¶ 45 PRESIDING JUSTICE MIKVA, dissenting:

¶ 46 I agree with the majority that our supreme court has made it clear that young adults—aged 18 or older—are not presumed to be the same as juveniles, and as such will not automatically be able to claim—under *Miller* and its progeny—that a life sentence is unconstitutional. But in the past five years our supreme court has twice acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). See *Thompson*, 2015 IL 118151, ¶ 44 (noting that a defendant, who was 19 years old at the time of his crime, could not bring such a claim for the first time on direct appeal but was "not necessarily foreclosed" from asserting it in postconviction proceedings); see also *Harris*, 2018 IL 121932, ¶ 48 (concluding that the as-applied, youth-based sentencing claim of a defendant who was 18 at the time of his crime was "more appropriately raised" in postconviction proceedings). In doing so, the court opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in *Miller*, was "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community" (*People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009) (stating what is required to succeed on a proportionate penalties claim)).

¶ 47 The majority in this case holds, however, that Mr. Gomez has no basis on which to make such a claim. While I agree with the majority that the fact that Mr. Gomez was found guilty on a theory of accountability does not, in and of itself, mean that his life sentence is unconstitutionally disproportionate, by ending its analysis there, the majority fails to consider the actual basis for Mr. Gomez's potential claim. As he explains in his proposed successive postconviction petition, Mr. Gomez was the product of severe abuse and neglect at home that he argues disrupted and delayed his development. He was also just barely 18 years old at the time of the crime. This background, the impulsive nature of the crime, the emerging science of brain development, and the fact that he has made commendable efforts to better himself while incarcerated, reflecting an ability to mature, all provide some basis for a postconviction claim that a life sentence, as applied to him, is unconstitutional.

- 10 -

¶ 48    Thus far, we have had little guidance from our supreme court as to what is required for a young adult to succeed on an as-applied constitutional challenge to a life sentence. I would reverse the denial of Mr. Gomez's motion for leave and remand for second stage proceedings on his successive petition. It is unclear whether Mr. Gomez will be able to make a substantial showing that the *de facto* life sentence he received, as applied to him, violates the proportionate penalties clause of the Illinois Constitution. But it is an argument our supreme court has said is available to defendants like Mr. Gomez, and one he has so far been prevented from making. He should at least have that opportunity.