2023 IL App (1st) 200646-U
No. 1-20-0646

FIRST DIVISION
August 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 1785 |
| | ) | |
| EUGENE SPENCER, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

_____

JUSTICE Pucinski delivered the judgment of the court.
Justice Coghlan specially concurred.
Justice Hyman concurred in part and dissented in part.

**ORDER**

¶ 1    *Held:* Defendant's convictions for first degree murder, attempt first degree murder, and home invasion affirmed over defendant's challenge that his conviction should be reversed because trial counsel was ineffective for failing to file a motion to suppress his statement on the basis that his arrest, pursuant to an investigative alert with probable cause, was unconstitutional. Defendant's sentences affirmed over his challenge that the trial court erred in considering an improper factor, demonstrated animosity towards defendant in its comments, failed to consider the mitigating factors applicable to juveniles, and his *de facto* life sentence was unconstitutional.

¶ 2    Defendant Eugene Spencer was charged in a multi-count indictment along with his

codefendants, Qawmane Wilson (Wilson) and Loriana Johnson (Johnson) in the home invasion

and murder of Wilson's mother, Yolanda Holmes, and the attempt first degree murder of Curtis Wyatt. Following a jury trial in which Wilson was tried before a separate jury, defendant was convicted of first degree murder (720 ILCS 5/9-1(A)(1)); attempt first degree murder and during the commission of the offense he personally discharged a firearm (720 ILCS 5/8-4(a)); and home invasion and during the commission of the offense he personally discharged a firearm. (720 ILCS 5/12-11(a)(4)). He was sentenced to consecutive terms of 50 years' imprisonment for first degree murder, 25 years' imprisonment for attempt first degree murder, and 25 years' imprisonment for home invasion. Defendant appeals his conviction and sentence, arguing that his trial counsel was ineffective for failing to file a motion to suppress his statement on the basis that his arrest, pursuant to an investigative alert with probable cause, was unconstitutional. He appeals his sentence on the grounds that the trial court erred in considering an improper factor, demonstrated animosity towards defendant in its comments, failed to consider the mitigating factors applicable to juveniles, and his *de facto* life sentence was unconstitutional. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 3                                     BACKGROUND

¶ 4                                        Trial

¶ 5                                  Loriana Johnson

¶ 6        Loriana Johnson[1] testified that she was dating Wilson in September of 2012 for the past year. Approximately one week before September 2, 2012, she had a cell phone conversation with Wilson during which he asked her if she could take his friend somewhere to "make a run." He said he would let her know when and would pay for her gasoline. Then, at approximately 2:00 a.m. on

_____

[1] Johnson was originally charged in the indictment with first degree murder and attempt first degree murder, but she pled guilty to an amended count of armed robbery and was sentenced to 14 years' imprisonment as part of a plea agreement with the State and in exchange for her truthful testimony.

September 2, 2012, Wilson called her and asked her if she could bring a gun to his house. She described it as a "cowboy gun" and "the spinner." The gun was hidden in her closet underneath her daughter's clothes. She testified that the gun did not belong to her, and she had not put the gun there. She hid the gun in a bookbag and drove to Wilson's house in a red Ford Taurus.

¶ 7    When she arrived at Wilson's house, Wilson and defendant were standing outside. She did not know that defendant lived in this house with his own family. She handed the bookbag containing the gun to Wilson who took it inside his house, followed by Johnson and defendant. Wilson took the gun out of the bag and wiped it off with a cloth. Johnson heard Wilson say to defendant to "take everything" which she understood to mean that this was a robbery, but she did not hear them use that word. She also heard Wilson say, "[s]omething about a him" and the clothes that defendant had with him. She saw defendant leave the living room, but she did not see where he went. She and Wilson talked and had sexual intercourse. Afterwards, she saw that defendant had clothes with him and defendant asked her to take Wilson "up north." She did not see Wilson hand any clothes to defendant, but she thought that the clothes belonged to defendant, not Wilson. She did not see defendant with a gun or a knife.

¶ 8    She left Wilson's house with defendant in the back seat of her car. She followed Wilson, who was driving his silver Ford Mustang. She spoke with Wilson over the phone, as she got lost several times, while he led her to the address of 1026 West Montrose, Chicago. She parked the car, and defendant exited the car holding clothes on hangers and walking towards the apartment building at that address. At some point, Wilson told her that he was going to exit the car and wait. Ten minutes later, defendant came back to her car and sat in the back seat, and she noticed that he was not wearing shoes, sweating and panicking, and smelled an odor, "like blood", on him. She did not see him with a gun, a knife, drugs, or any property from inside the apartment. As she drove away,

she asked him what the smell was, and defendant "snapped" and said, "I had to do it." He said that the gun jammed and then he grabbed a knife. In an alley on the south side of Chicago, defendant took the clothes that he was holding and threw them into a dumpster. At that point, she looked in the back seat and saw blood on that part of the seat, which was not previously there.

¶ 9        Johnson further testified that on December 23, 2013, at approximately 2:30 p.m., she was arrested and interviewed by Chicago police detectives. She spent approximately twelve hours at the police station before she was released. She admitted that she initially lied to the detectives about her involvement in and knowledge of the murder. She eventually told the detectives that a week before the murder, Wilson called her and said he was going to need her to drive someone somewhere. She testified that she would not have been involved if she knew that Wilson and Spencer were going to kill or rob someone. She also told the detectives that she heard defendant and Wilson say that there was "some dude" in the apartment and he was supposed to fight with him, but she did not think they were serious.

¶ 10        At trial, Johnson viewed a still photo taken from a security video of the apartment building where Holmes lived and identified defendant as the person in the photo seen holding clothes and laundry detergent. She also identified that clothing that defendant was carrying in the photo as the same clothes that she saw in defendant's possession after they left Wilson's home.

¶ 11                                    Curtis Wyatt

¶ 12        Curtis Wyatt testified that he and Yolanda Holmes had previously dated for five years before breaking up in 2012. He testified that Holmes owned a hair salon and drove a black Lexus SUV, which she parked in the parking garage of her apartment building. Wyatt testified that Holmes had one son, Wilson, and that Wilson drove a Ford Mustang that Holmes had purchased for him.

¶ 13    Around 10:00 p.m., on September 1, 2012, Wyatt went to meet Holmes at her fourth-floor apartment, located at 1026 West Montrose. He had a conversation with Wyatt earlier that evening in which Holmes convinced him to come to her apartment. When he arrived, Holmes "buzzed" him into the building as he did not have a key fob to enter the building. No one else was at the apartment when he arrived, but Holmes shared the apartment with her niece, Kierra. After Wyatt and Holmes had sexual intercourse, they fell asleep together in her bedroom. He woke up when he heard Holmes speaking to someone on the phone. She told him that she was talking to Wilson. Wyatt went back to sleep, so he did not know if Holmes got out of bed after the phone call.

¶ 14    He woke up a second time to the sound of a gunshot. Wyatt jumped out of the bed and saw a male on the other side of the bed, approximately six feet away. At trial, Wyatt identified defendant as this person. Defendant fired two shots at Wyatt then hit him in the head with the gun eight to ten times. Wyatt tried to defend himself and their fight spilled out into the hallway. Defendant also tried to strangle him and grabbed his testicles, but then Wyatt clawed at him. Wyatt grabbed a knife from the kitchen, looked around the apartment and saw that defendant had left. Wyatt checked on Holmes and saw her lying halfway off the bed with a gunshot wound. Wyatt called 911 twice and the audio from those calls were played at trial. He washed his hands in the bathroom sink as they were covered in blood. Wyatt took one of the passenger elevators to the lobby to let the police and paramedics into the building. A surveillance video from the lobby area showed Wyatt opening the door and having a large amount of blood on the back of his head.

¶ 15    After Wyatt was treated for his injuries at the hospital, he went to the police station and agreed to submit to a buccal swab for DNA analysis, a gunshot residue kit for his hands, and to have cellular material collected from underneath his fingernails. Wyatt did not remember telling the police that he heard four to six gunshots fired, that the offender was standing in the doorway at the

time, or that the offender was a black male, six feet tall, 210 pounds, and had braids or dreadlocks. He did not remember telling them that it was dark inside the apartment and that it was too dark to see the offender's features. He also did not remember when he told the police about grabbing a knife. The police recovered his clothing at the hospital. He stayed in contact with the police for any updates. On December 23, 2013, Wyatt identified defendant as the shooter in a physical lineup. He also identified defendant as the shooter at trial.

¶ 16     At trial, Wyatt identified several photos of Holmes' apartment. The photos showed red stains in several areas of the apartment, including on the front entryway floor tile, a hole in the wall by the headboard of Holmes' bed, and a white mark on the headboard of that same bed. He also identified photos of a handgun and a white earbud on the floor. He testified that he did not see the handgun or the earbud on the floor before he went to bed, and he never saw anyone drop either of these items. He identified a photo of the kitchen where he removed a knife from a knife block on the counter and another photo showing the knife that he removed, and broken into two pieces, in the front doorway area of the apartment. He did not recall how the knife was broken or if he broke it. He also identified a Taurus 9 mm semiautomatic handgun, found inside a cloth bag in the bedroom closet, as the gun that he had previously purchased and kept in a lockbox at Chase Bank. Both he and Holmes had keys to that lock box, but he did not know that the gun was inside her apartment. On September 12, 2012, he went to the lock box to remove that gun and learned that someone else had taken it out. From a still photo taken from a surveillance video, taken at the time of the murder, Wyatt identified Wilson's Ford Mustang parked behind Holmes' apartment building.

¶ 17     On cross-examination, Wyatt testified that, prior to Holmes' death, he had not seen her since May 6, 2012, when he was arrested upon getting into a fight with Holmes' brother-in-law. A group

of people were watching a boxing match on television at the time. Wyatt denied that he threatened to get a gun and kill Holmes or her sister, Yunae. Wyatt and Holmes lived together at times during their five-year relationship. He denied that he opened the apartment door for anyone to come into the apartment that night and that he fought with that person to create a crime scene. He explained that, because only a landline could be used, he could not have used his own cell phone to allow someone to enter the building.

¶ 18                       Chicago Police Officer Armando Martinez

¶ 19      Chicago Police Officer Armando Martinez testified that he responded to the radio call. He and his partner took an elevator to the fourth floor and met up with two other officers. When the apartment door opened, Officer Martinez immediately saw puddles of blood on the hallway floor and smeared blood on the walls and furniture. He identified a photo of Holmes lying halfway on the bed as the position she was in when they entered the bedroom. He also identified another photo of the revolver that they found on the bedroom floor. He later learned that there were security cameras inside the common areas of the apartment building and at trial, identified videos, taken from these cameras, of the officers' arrival on the fourth floor.

¶ 20                       Chicago Paramedic Vincent Zittman

¶ 21      Chicago Paramedic Vincent Zittman was called to the scene at 5:20 a.m., He observed Holmes with a gunshot wound to her head, but she was not breathing and did not have a pulse. The police had declared the apartment and common areas to be a crime scene, so he did not render any lifesaving techniques to her and did not move her body.

¶ 22                       Chicago Police Officer Eric Szwed

¶ 23      Chicago Police Officer Eric Szwed, a forensic investigator, processed the scene. The lobby and entry areas, stairwell and Holmes' apartment were secured by crime scene tape. Officer Szwed

also took photographs of these areas, which were introduced at trial. The photos showed that the entrance to the apartment building had a secure door that locked automatically, along with a call box on the wall. He found blood on the glass of the interior door to the lobby as well as on the two handicapped access pads on the wall. Officer Szwed also processed the stairwell from the fourth floor to the first floor. On the fourth-floor stairwell, he found a white long-sleeve shirt on the floor and some faint bloody footwear impressions on the floor nearby. In the stairwell landing between the fourth and fifth floors, he also found a plastic hanger with blood on it as well as a faint swipe of blood on the wall nearby. He found some additional blood on the corner wall of the stairwell between the second and third floor, on the interior handle of the gate to exit the stairwell between the first and second floors, and on the door leading to the lobby area. In total, he collected blood swabs from six different locations inside that stairwell.

¶ 24    Officer Szwed also took photographs and collected evidence from Holmes' apartment. He testified that the photographs showed the entryway into Holmes' apartment with a "significant amount of blood" on the floor, walls and on the door, and a knife handle with a broken blade on the floor.[2] There were also five $20 bills on the floor. There was no damage to the locking mechanism to the apartment door. The photos taken from inside Holmes' bedroom showed four fired bullets. One bullet was found on the floor behind the bed, another bullet was found inside the wall behind the bed, and two fired bullets were found inside the mattress. He also photographed a revolver with two fired cartridge cases still in the cylinder on the bedroom floor, and an earbud on the bedroom floor. For future DNA analysis, Officer Szwed swabbed the handle of the grip and the trigger portions of the revolver. There was also a defect in the white area of the headboard with

_____

[2] Curtis Wyatt identified this broken knife as the knife that he grabbed from the kitchen and Officer Szwed testified that he photographed and recovered the broken knife from the entryway. However, there is no testimony that any other knife was recovered from the scene.

cotton coming out of the headboard, a defect in the wall behind the headboard, and a hole in the wall above the headboard. Officer Szwed also found a brown paper bag containing two bags of white powder, suspect narcotics, in the corner of the bedroom behind a storage container. The State admitted into evidence a photo of the 9 mm semiautomatic pistol, which was found inside a cloth bag in the closet, as well as a photo of a magazine that matched this weapon, which was found in the top drawer of a storage rack.

¶ 25    Officer Szwed went to the hospital and administered a gunshot residue evidence collection kit to Wyatt. Wyatt's hands had not been "bagged" prior to this test. He took photographs of Wyatt's injuries and collected his clothing. It was stipulated that Officer Szwed also collected the buccal swab and fingernail scrapings from Wyatt.

¶ 26                                    Andrzej Sisson

¶ 27    Andrzej Sisson testified that he was responsible for the installation and management of the video surveillance system in the apartment building where Holmes died. On September 12, 2012, Sisson went to that location along with some police officers and building management to assist in securing the videos from the surveillance system, which allowed for digital storage of approximately 30 days. The police officers specified to him which time frames and which cameras to download to limit the amount of data that needed to be transferred. During his testimony, the State introduced 25 different photos taken from the surveillance cameras stationed in the front and rear exterior, the front lobby and vestibule, the freight elevator, the passenger elevator, and the fourth-floor hallway.

¶ 28                                    Darrell Dautrieve

¶ 29    Darrell Dautrieve testified that he was the property manager for the apartment building at the time of this offense. He testified that a person needed to use a key fob, which looked like a credit

card, to enter the apartment building. If someone did not have a key fob, they would type in the last name of the person to get the unit number, type in that number, and it would automatically ring into the apartment through a landline phone. The person in the apartment could then unlock the front door by pressing a certain number combination. He knew that Wilson was not issued a key fob. He spoke to Wilson at the apartment building after the murder and told him how sorry he was for his loss. Wilson did not say anything in response, When Dautrieve continued to console him, Wilson did not react.

¶ 30        During his testimony, the State introduced several surveillance videos, and Dautrieve described the physical layout of the building as well as what he saw at various parts of the videos. One of the videos showed a person, wearing white shoes, entering the building and walking towards the elevators holding clothes and a bottle of laundry detergent. The video also showed this same person enter the freight elevator holding these same items, tighten the hood on his sweatshirt, and then exit the elevator on the fourth floor holding these same items. He also identified another video, taken from the rear exterior of the apartment building, showing a car going the wrong way in the alley behind the building and then pulling into the parking area.

¶ 31                                            Mike Parker

¶ 32        Mike Parker testified that he was another resident who lived in an apartment on the fourth floor of this building, testified that he was trying to enter the building around 4:30 or 5:00 a.m. but had forgotten his key fob. He was able to get inside when someone was leaving the building during that same time. Parker had never met this person before but described him as a male. Surveillance videos showed him entering the building and walking past this male. He spoke to the police about what he saw. On December 23, 2013, he was unable to make an identification in a physical lineup.

¶ 33                                     Doctor Ponni Arunkumar

¶ 34　　Doctor Ponni Arunkumar testified that she reviewed the autopsy of Holmes performed by another assistant medical examiner. There was a gunshot wound to the right side of her head with evidence of stippling, meaning that the shot was fired from within two feet. A deformed medium caliber silver jacketed lead bullet was recovered from her brain. She also had two stab wounds to her abdomen, which caused bleeding in her abdominal cavity. She could not determine which injury occurred first or second. In her expert opinion, the cause of death was gunshot wound to the head and multiple stab wounds being a contributing factor to the death. The manner of death was homicide. A forensic investigator collected evidence from the autopsy, including a blood card for Holmes', her clothing, right and left-hand fingernail clippings, and a fired bullet.

¶ 35　　　　　　　　　　　　　　　　Dena Inempolideis

¶ 36　　Several forensic analysts from the Illinois State Police Forensic Science Center examined some of the evidence collected in this case. Firearms expert Dena Inempolidis testified that she determined that the Colt Model .38 Special caliber revolver was the weapon that fired the bullet recovered from Holmes' brain as well as the three of the four other bullets recovered from the bedroom. She could not eliminate the revolver as the source of the fourth bullet recovered from the bedroom. She also determined that this revolver, which showed damage to the wooden handle, jammed and misfired when she initially test-fired it. From the shell casings recovered from the bedroom, she did not perform any type of comparison with the 9 mm semiautomatic handgun found in the bedroom closet. She explained that these shell casings are not the type of ammunition that could be fired from that type of weapon because of the difference in the calibers.

¶ 37　　　　　　　　　　　　　　　　Sheila Daugherty

¶ 38    Sheila Daughtery, who was qualified as an expert in the field of latent fingerprints, tested the two portions of the broken knife as well as one plastic hanger. She found no suitable latent fingerprint impressions on any of these items.

¶ 39                                    Bill Cheng

¶ 40    Bill Cheng, who was qualified as an expert in the field of forensic biology, tested the plastic hanger for the presence of blood. He swabbed the item, blood was indicated, and he preserved the sample for further testing.

¶ 41                                 Elizabeth Zawicki

¶ 42    Elizabeth Zawicki, who was qualified as an expert in the field of forensic biology, tested various pieces of evidence recovered in this case for the presence of cellular material. She tested the two portions of the broken knife and determined that blood was indicated on both the handle portion of the knife, as well as the blade portion. Zawicki testified that she swabbed the inner portion of the earbud, that would go inside a person's ear, and found cellular material. She swabbed the outer portion of the earbud and blood was indicated. When Zawicki analyzed the white shirt, blood was indicated, and the entire stain was preserved for DNA analysis. She swabbed the inside of the shirt cuffs for the presence of cellular material and preserved it for DNA analysis She also swabbed the fingernail scrapings for Curtis Wyatt for cellular material, and she preserved these samples for DNA analysis. Her testing also indicated that blood was present.

¶ 43                                 Jennifer Belna

¶ 44    Jennifer Belna, who was qualified as an expert in the field of forensic DNA analysis, testified that she conducted a DNA analysis on the buccal swab standard collected from defendant and was able to identify a DNA profile which was suitable for comparison. She also conducted a DNA analysis on the cellular material from the earbud found inside the bedroom, and she identified a

human male DNA profile. She compared this human male DNA profile with the DNA profile of defendant. She testified that this human male DNA profile on the earbud matched the DNA profile of defendant and did not match the profile of Wyatt. She explained that this profile would be expected to occur in approximately one in 8.7 quintillion black, one in 3.7 sextillion white, and one in 550 quintillion Hispanic unrelated individuals. She further testified that the blood on the outside of the earbud matched the DNA of Wyatt. She explained that this profile match would be expected to occur in approximately one in 1.4 billion black, one in 51 billion white, or one in 22 billion Hispanic unrelated individuals.

¶ 45    Belna also testified that she concluded that the blood found on both parts of the broken knife matched the DNA profile of Wyatt. Belna testified that the DNA analysis indicated a human male DNA profile which matched the DNA profile of Wyatt and did not match the DNA profile of Spencer. The sample from the first-floor stairwell also tested positive for blood and the human male DNA profile was identified as that of Wyatt. This profile was expected to occur in approximately one in 1.7 sextillion black, one in 200 sextillion white, or one in 53 sextillion Hispanic unrelated individuals. The DNA analysis of the cuff of the white shirt revealed a partial mixture of human DNA profile with at least two people in this mixture. The analyst was unable to separate out the parts of that mixture and was unable to determine a single profile.

¶ 46    The fingernail clippings from Wyatt's right hand matched the DNA profile of Wyatt, and the fingernail clippings from his left hand showed a mixture of two human DNA profiles. The major contributor of the DNA profile was Wyatt, and the remaining parts of the mixture was not suitable for comparison.

¶ 47                                 Ellen Chapman

¶ 48    The gunshot residue test for Wyatt was analyzed by Ellen Chapman. The time of the shooting was listed as 5:11 a.m., and the GSR kit was administered at 8:40 p.m. Chapman concluded that Wyatt may not have discharged a firearm with right hand, and if he did discharge a firearm then the particles were removed by activity, were not deposited, or were not detected by the procedure. Handwashing has the potential to remove these types of particles.

¶ 49    The State introduced cell phone records between defendant, Wilson, and Holmes for the time period around the murder. Another forensic analyst, Rosa Lopez testified that she tested the white powder and determined that it tested positive for the presence of cocaine. The substance weighed 58.5 grams.

¶ 50    The State introduced certified bank records from JP Morgan Case Bank showing that Wilson withdrew approximately $70,000 eleven days after the murder from his mother's bank account.

¶ 51                                Joseph Sierra

¶ 52    Joseph Sierra testified that he was a custodian of records for T-Mobile. On October 11, 2012, T-Mobile responded to a subpoena, dated September 14, 2012, for the phone numbers registered to Holmes and Wyatt. When T-Mobile searched the phone records associated with the phone number of Holmes, they discovered that there was a second phone number associated with that account. Defendant concedes that this second phone number "apparently belonged to Wilson," and the phone records showed an outgoing call from this second phone number at 4:21 a.m. on September 2, 2019, to Holmes.

¶ 53                    Chicago Police Officer Karen Burgess

¶ 54    Chicago Police Officer Karen Burgess testified that on December 21, 2013, at 9:30 p.m., she spoke to Wilson while investigating a car where the license plate did not match the vehicle registration. She learned Wilson's name and ran his name in the police computer. When she did

so, she learned that a police detective had issued an investigative alert with no probable cause for Wilson. She called the police district, determined that the alert was still active, and spoke with Chicago Police Detective Michelle Wood. Detective Wood said that she still would like to speak to Wilson about the death of his mother and asked the officer to ask Wilson if he would be willing to come to the police station to speak with her regarding the investigation. Returning to the other officers and the other men, she informed Wilson about the alert. Wilson agreed to go with the officers to the police station to speak with Detective Wood. Detective Burgess transported Wilson to the police station. She left him in the waiting room area outside the detective's division while she located Detective Wood.

¶ 55                    Chicago Police Detective Michelle Wood

¶ 56    Chicago Police Detective Michelle Wood testified that she and her partner, Detective John Korolis, were assigned to investigate this case and arrived at the scene at approximately 5:30 p.m. on September 2, 2012. When the detectives interviewed Wyatt, Detective Wood noticed that Wyatt had a head injury. After Wyatt received medical treatment, she arranged for Wyatt to be transported to the Area North detective division where they spoke with him for about thirty minutes. He was not considered to be a suspect and was free to leave after their conversation.

¶ 57    On September 4, 2012, the detectives met with Wilson and Holmes' sister, Yunae Holmes, in a conference room located in the Area North detective division for approximately 30 minutes. During the investigation, Detective Wood learned that Holmes drove a black Lexus SUV, which the police found in a parking garage attached to the apartment building. She did not have the car processed for evidence because she did not think that it contained anything of evidentiary value.

¶ 58    Subsequently, Detective Wood ordered and reviewed cell phone records for Holmes and Wyatt because she had discovered that the only way to get into Holmes' apartment "was to be buzzed in

via the phone." When she received these records, she did not have a suspect. She attempted to identify anyone who called Holmes shortly before her death. She noticed a series of telephone calls around the time of the murder. She noticed that one number in particular, which was later determined to belong to a cell phone used by Wilson and requested the cell phone records for that number. A phone number belonging to defendant's cell phone appeared in the cell phone records for the cell phone used by Wilson.

¶ 59 Afterwards, she issued an investigative alert with no probable cause to arrest for both defendant and Wilson. She explained that she wanted to speak with defendant regarding why his cell phone number was contained in the cell phone records. She did not testify as to the date that this investigative alert was issued.

¶ 60 In October of 2013, she also asked Dane Brown, who was friends with Wyatt and lived with him around the time of the murder, to come to the station to submit to a buccal swab for subsequent DNA analysis. Detective Wood explained that the police thought that the offender might have known Wyatt and wanted to eliminate Brown as a possible suspect.

¶ 61 On December 21, 2013, Detective Wood received a phone call from Officer Burgess. She asked Officer Burgess to ask Wilson if he was willing to come to the police station to speak with her regarding this investigation. At approximately 10:00 p.m., Wilson arrived at the station where she spoke with him. After that conversation, she requested that other members of her team, as well as Chicago Police Officer Jeremiah Johnson with the fugitive apprehension unit, try find defendant and place him into custody. On December 23rd, at 2:00 a.m., she learned that defendant was placed under arrest at 411 North Hamlin, Chicago.

¶ 62 On December 23, 2013, at 3:08 a.m., defendant waived his *Miranda* rights. This interview was videorecorded and played at trial. Defendant denied any knowledge or involvement in Holmes'

murder. At 3:42 a.m., during a second interview, after defendant initially denied any knowledge or involvement, he admitted that he went to the apartment to run an errand for Wilson, and while there, he was attacked by a man as soon as he walked into the apartment. He denied that he brought a gun with him and that he shot or stabbed a woman inside the apartment. He stated that Wilson set him up to be killed and that he was lucky to be alive.

¶ 63    The detectives told defendant that they thought he was lying. At that point, he admitted that he brought a gun with him and that he shot at the woman while he was firing at the man in self-defense. The detectives informed defendant that cell phone records showed that he and Wilson were in contact after the shooting.

¶ 64    Defendant provided more details to the detectives. He explained that he entered the apartment building because Wilson called Holmes to ask to buzz him in. Wilson provided instruction to him from his cell phone, and defendant listened to him through an earbud. Defendant admitted that he entered Holmes' apartment through an unlocked door, shot Holmes in the head and then repeatedly stabbed her. He decided to stab the woman because Wilson said to him over the phone, "Is that bitch dead? Make sure." He fought with the man inside the apartment and knocked him out. Defendant also stated that he removed the knife that he used to stab Holmes from the apartment and gave it to Loriana Johnson. Several times during the interview, defendant stated that Holmes had "visited him" in his dreams. He insisted that he did not know that Holmes was Wilson's mother. Defendant admitted that Wilson offered him $4200 to commit the crime and that he only received $70.

¶ 65                    Chicago Police Officer Jeremiah Johnson

¶ 66    Chicago Police Officer Jeremiah Johnson testified that he was assigned to the fugitive apprehension unit, and on December 23, 2013, at 6:00 a.m., he and his partners were assigned to

an investigative alert for defendant. He and his partners found defendant at 411 North Hamlin, a single-family residence. At 2:00 a.m. on December 23rd, 2013, defendant placed under arrest, transported him to Area North police district, and placed him in an interview room. At 1:35 p.m. that same day, they located Loriana Johnson, placed her under arrest, and placed her in a separate interview room.

¶ 67                                    Defense Case-in-Chief

¶ 68    Defendant presented the testimony of Chicago Police Detective Timothy Dusenberry regarding his interview with Wyatt as Wyatt was being treated for his head injuries at Weiss Hospital on ~~December~~ September 2, 2012, at approximately 6:22 p.m. Wyatt told him that he heard four to six gunshots, saw the shooter standing in the doorway to the bedroom while the shots were fired, described the bedroom as being dark, but described the shooter as six feet tall, 210 pounds, and had braided hair or dreadlocks.

¶ 69                                           Verdict

¶ 70    The jury found defendant guilty of first degree murder, attempt first degree murder during which he personally discharged a firearm, and home invasion during which he personally discharged a firearm.

¶ 71                                     Sentencing Hearing

¶ 72    After the trial court denied defendant's motion for a new trial, the case proceeded to the sentencing hearing where the State presented the victim-witness statements of Yunae Holmes and Curtis Wyatt. The State also presented the testimony of Steven Wilensky, who was previously the Director of Inmate Discipline at Cook County Department of Corrections. The 89-page disciplinary report for defendant showed that he had disciplinary infractions 36 different times, including 14 infractions for public masturbation. Defendant masturbated in front of a nurse who

was dispensing medication, and on two different occasions, masturbated in front of an assistant public defender. He was charged criminally, and these three cases were pending at the time of sentencing. He was also charged criminally for two different cases of battery to jail staff, and these two cases were pending at the time of sentencing. Cook County Department of Corrections Officer Matthew Lyday testified that defendant struck him in the face when the officer was attempting to remove him from his cell. The officer suffered cuts and bruises to his eye and to his right hand. Cook County Department of Corrections Officer Carlos Campos testified that he was performing a check of the cell locks when defendant sprayed him with a bottle containing urine and feces, forced the cell door open, and struck the officer. Defendant was also issued violations for possessing asthma pumps that are commonly used to make shanks, stolen jail keys, and a jail-made intoxicant referred to as "hooch" on three different occasions, as well as a sharpened metal object.

¶ 73        In mitigation, defense counsel argued that defendant, who was 20 years old at the time that he committed these offenses, was a youthful offender, and should be subject to the same analysis as the caselaw for juvenile offenders. The trial court agreed with the State's argument that this sentencing statute was inapplicable because defendant was not a juvenile when he committed the offense, finding that there was no caselaw requiring to him consider these factors to an adult offender, and declined to consider these statutory factors.

¶ 74                                              Sentence

¶ 75        The trial court sentenced defendant to consecutive sentences of 50 years' imprisonment for first degree murder, 25 years' imprisonment for attempt first degree murder while personally discharging a firearm, and 25 years' imprisonment for home invasion while personally discharging a firearm.

¶ 76                                              ANALYSIS

¶ 77                              **I. Failure to File Motion to Suppress**

¶ 78       Defendant initially contends that his trial counsel was ineffective for failing to file a motion to suppress on the grounds that his arrest, pursuant to an investigative alert with probable cause, violated the Illinois constitution. Defendant maintains that his trial counsel could have successfully moved to suppress the arrest, and then his videotaped statement would not have been allowed into evidence for the jury's consideration.

¶ 79       Defendant points out that the Illinois constitution requires an affidavit to be signed by a neutral magistrate who makes a probable cause determination pursuant to Ill. Const. 1970, art. I, § 6, to support a seizure. This section provides:

> "The people shall have the right to be secure in their persons, houses, papers, and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, ¶ 6

¶ 80       Here, no affidavit was signed by a neutral magistrate with facts supporting a probable cause determination. While Detective Wood initially issued an investigative alert with no probable cause to arrest for defendant in 2012, after she spoke with defendant on December 21-22, 2013, she issued an investigative alert with probable cause to arrest for defendant. She asked other members of her team, as well as Chicago Police Officer Jeremiah Johnson of the fugitive apprehension unit, to locate and arrest defendant. While she did not testify as to a specific time, she testified that she did so sometime after she had concluded an interview of Wilson, commenced at 10:00 p.m. on December 21, 2013. Officer Johnson testified that on December 22, 2013, at 6:00 a.m., he and his

partners were assigned to an investigative alert for defendant. He and his partners found defendant at 2:00 a.m. the next day and placed him under arrest.

¶ 81 Defendant does not assert that there was a lack of probable cause to arrest him when the police issued the investigative alert with probable cause. He also does not claim that his arrest violated the fourth amendment of the United States Constitution. U.S. Const. amend. IV. Instead, relying on *People v. Bass*, 2019 IL App (1st) 160640 (affirmed in part and vacated in part by *People v. Bass*, 2021 IL 125434), and *People v. Smith*, 2022 IL App (1st) 190691, defendant argues that we should likewise find that his arrest was unconstitutional, and therefore, his counsel was ineffective for failing to file a motion to challenge his arrest on this basis.

¶ 82 The State contends that a motion by trial counsel arguing that the investigative alert was unconstitutional would have been meritless in this case, therefore, counsel could not have been ineffective. Initially, the State points out the defendant does not contest that there was probable cause and asks us to find that an arrest based on probable cause and an investigative alert is constitutional. The State also argues defense counsel cannot be found to ineffective where *Bass* was decided prior to defendant's trial and counsel's performance can only be measured by the legal authority available to him at the time. Regarding the prejudice prong, the State argues that defendant cannot establish that he was prejudiced by this evidence where defendant was convicted by overwhelming evidence that was not the product of the arrest. Alternatively, the State argues that defendant's confession would not have been suppressed because the police acted in good faith in reliance on prior appellate precedent.

¶ 83 It is well-established that a claim of ineffective assistance of counsel is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Evans*, 209 Ill.2d 195, 219 (2004). Under *Strickland*, a defendant must demonstrate that (1) counsel's

performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense because absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 219-20. A reasonable probability of a different result is not merely a possibility of a different result but a probability that is sufficient to undermine the confidence in the outcome. *Id*. A defendant must satisfy both the performance and prejudice prongs of *Strickland*, to prevail on this claim. *Id*.

¶ 84    Here, defendant's claim involves a failure to file a motion to suppress. The decision to file a motion to suppress is generally considered a matter of trial strategy, which is "entitled to great deference." *People v. Gayden*, 2020 IL 123505, ¶ 28. To establish ineffective assistance based on trial counsel's failure to file a motion to suppress, "the defendant must demonstrate both that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id*.

¶ 85    Here, we must decide the merit of defendant's claim that his arrest pursuant to an investigative alert with probable cause violated the Illinois constitution. Previously, in *Bass*, the plurality of the court held that an arrest made solely on the authority of an investigative alert *per se* violates the search-and-seizure clause of the Illinois Constitution, even if the alert was based on probable cause. *Bass*, 2019 IL App (1st) 160640, ¶¶ 36-71 (Mason, J., concurring in part and dissenting in part)). Upon the State's petition for leave to appeal, our supreme court affirmed the appellate court's judgment on the ground that the police exceeded the permissible scope of a traffic stop. *Bass*, 2021 IL 125434, ¶¶ 15-26. However, our supreme court declined to address the constitutionality of investigative alerts, reasoning that courts should not "decide moot or abstract questions" or render "advisory opinions" and "must avoid reaching constitutional issues unless necessary to decide a

case. [Citations]" *Id.* ¶¶ 29-30. Our supreme court "vacated" the portions of the appellate opinion that addressed the constitutionality of investigative alerts. *Id.* ¶¶ 30-31.

¶ 86    Then, in *Smith*, the plurality of the court re-adopted the reasoning of *Bass* and found that the defendant's warrantless arrest, six months after an investigative alert, was improper because the police had ample opportunity to obtain an arrest warrant, and the arresting officer had no other reason to believe that defendant had committed a crime. *People v. Smith*, 2022 IL App (1st) 190691, ¶¶ 66-100 (petition for leave to appeal filed and pending). The *Smith* majority recognized that the fourth amendment to the United States Constitution did not require police to obtain an arrest warrant from a judge. *Id.* ¶ 68. The court, however, found that the state constitution affords greater protection than the analogous requirement of the fourth amendment, and it contemplates that an arrest warrant shall issue after an "affidavit" is submitted to a neutral magistrate for a determination of probable cause. *Id.* ¶ 78 (citing Ill. Const. 1970, art. I, § 6). An investigative alert circumvents the role of a magistrate, as it allows for an arrest based on a probable cause determination made by the Chicago police, rather than a neutral judge. *Id.* ¶ 89 (citing *People v. McGurn*, 341 Ill.632 (1930) (an arrest cannot be solely based on a "standing order" from a superior officer, as "under the constitution of this state no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law").[3]

¶ 87    Ultimately, the *Smith* majority reasoned that an arrest pursuant only to an investigative alert resembled the kind of arrest that had been held unlawful in *McGurn* because the arresting officer had not observed the defendant committing a crime and did not have knowledge of the crime he

---

[3] More recently, our supreme court was considering the constitutionality of investigative alerts in *People v. Dossie*, 2023 IL 127412, but dismissed the appeal where the court could not secure the constitutionally required concurrence of four justices.

had allegedly committed, and the sole basis of the officer's decision to arrest the defendant was the investigative alert issued by another detective. *Id.* ¶ 94. The majority court also emphasized that six months had elapsed between the issuance of the investigative alert and the defendant's arrest, during which time the police could have sought a warrant but made no attempt to do so. *Id.* ¶ 96.

¶ 88　　We agree with the majority court's decision in *Smith*, and likewise find that the arrest of defendant in this case, pursuant only to an investigative alert, violated the search-and-seizure clause of the Illinois Constitution, even if the alert was based on probable cause. In doing so, we recognize that, in *Smith*, the majority court suggested that investigative alerts could be permissible for shorter time periods of approximately 24 to 48 hours if probable cause existed to suspect that the defendant might commit further crimes or be a flight risk. *Id.* ¶ 97. Here, while defendant was arrested within that time period, there is no evidence showing that the police were aware of information that defendant might commit further crimes or was a flight risk. Thus, the shortened time period in this case does not provide grounds for us to find that arrest of defendant pursuant to an investigatory alert was constitutional.

¶ 89　　Despite the illegality of his arrest pursuant to an investigative alert, we nevertheless affirm because defendant cannot establish that his trial counsel was incompetent for failing to predict that the existing law would change. Here, defendant's jury trial commenced on February 25, 2019, and *Bass* was decided on July 25, 2019. Trial counsel can only be measured by the legal authority available to him at the time. See *People v. Chatmon*, 2021 IL App (1st) 191919-U (citing *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38 (representation pursuant to the prevailing law at the time of trial is adequate, counsel is not tasked with predicting changes in the law to not be considered incompetent); *People v. English*, 2013 IL 112890, ¶¶ 34-35.

¶ 90    Defendant cites to passages within the concurring opinion in *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 51, and the majority opinion in *People v. Starks*, 2014 IL App (1st) 121169, as instances in which courts had already questioned the legality of investigative alerts. He suggests that this provided "more than sufficient legal basis to raise the issue." However, in those cases, the court's focus was on the existence of probable cause, and the law regarding the legality of investigative alerts had not changed. For trial counsel to be found to be ineffective, counsel must have failed to raise a meritorious issue; not an issue that could possibly found to be meritorious based upon a change in the law.

¶ 91    Regarding the prejudice prong of *Strickland*, defendant cannot establish that he was prejudiced where the other evidence of guilt was overwhelming. See *Smith*, 2022 IL App (1st) 190691, ¶¶ 101-109 (even though the defendant's arrest pursuant to an investigative alert was unconstitutional, the error was harmless where the evidence of the defendant's guilt was overwhelming); see also *People v. McCray*, 2022 IL App (1st) 191099-U, ¶¶ 99-100 (following *Smith*). Curtis Wyatt, the surviving victim, identified defendant as the person who attacked him that night. Corroborating Wyatt's testimony that defendant was present inside that bedroom was the admission of an earbud with defendant's DNA found on the inner portion of it and Wyatt's DNA on the outer portion of it.

¶ 92    Loriana Johnson also identified defendant as the person who was with Wilson when she handed Wilson the revolver and overheard discussions between them about a robbery. She transported defendant to and from Holmes' apartment building on the night of the murder. She explained that defendant exited the car holding clothes on hangers. When he came back to her car ten minutes later, she noticed that he was not wearing shoes, was sweating and panicking, and smelled an odor, "like blood", on him. As she drove away, she asked him what the smell was, and defendant

"snapped" and said, "I had to do it." Defendant told her that the gun jammed and then he grabbed a knife. This statement is corroborated by the autopsy results showing that Holmes died from gunshot wounds and stabs to her abdomen, ~~the recovery of a broken knife from the apartment~~, as well as the forensic analysis of the revolver recovered from the scene, which showed that it was the gun used in this offense, and that it initially jammed and misfired during test-firing. When defendant exited her car to throw his clothes into a dumpster, she saw blood on the back seat where he had been sitting.

¶ 93    The State also introduced security video from the apartment building showing a person matching defendant's description, taking the elevators to the fourth floor where Holmes' apartment was located, and then leaving that area and the apartment building. Johnson identified this person as defendant. The cell phone records also show multiple calls between Wilson and Johnson in the hours leading up to the murder, Wilson called Holmes at 4:21 a.m., followed by phone calls between defendant and Wilson.

¶ 94    We also find that it does not constitute a meritorious issue because the record does not reflect that the police had reason to believe that their conduct was unlawful. We agree with the State's argument that the police in this case acted in objectively reasonable, good-faith reliance upon the legal landscape that existed at the time of defendant's arrest, which permitted the use of investigative alerts supported by probable cause to effectuate an arrest. Thus, defendant would not be entitled to suppression.

¶ 95    "There is no constitutional right to the suppression of evidence obtained as a result of an illegal search and seizure." *People v. LeFlore*, 2015 L 116799, ¶ 22. The exclusionary rule is a judicially created remedy whose sole purpose is to deter future constitutional violations; thus, it is to be applied only where its deterrence benefits outweigh the substantial social costs of excluding

reliable, probative evidence of guilt. *Id.* ¶ 23. When the police conduct a search or seizure based on an "objectively reasonable good-faith belief" that it is lawful, the rule's deterrence rationale has little or no force, and the exclusion of evidence is not warranted. (Internal quotation marks omitted). ¶ 24. In determining whether the good-faith exception to the exclusionary rule applies in any case, the inquiry is "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Id.* ¶ 25.

¶ 96      When defendant was arrested in 2013, no case from a reviewing court had directly ruled on the legality of investigative alerts under our search-and-seizure clause. Moreover, as previously mentioned, defendant does not argue that the police did not have probable cause to arrest defendant at that time. "The existing cases, in short, never hinted that an arrest made pursuant to an investigative alert raised any constitutional questions beyond the existence of probable cause." *People v. Erwin*, 2023 IL App (1st) 200936, ¶ 39 (summarizing cases holding that police officer are entitled to act in reliance upon information received in official police communications). Thus, the facts and the legal landscape was such that the police officers' decision to rely on an investigative alert was objectively reasonable, implicating the good-faith exception to the exclusionary rule. We, therefore, find that defendant cannot establish the ineffectiveness of trial counsel.

¶ 97                              **II. Propriety of Defendant's Sentencing Hearing**

¶ 98      Defendant raises several challenges to his sentence. At the outset, in addressing these issues, neither party recognizes that defendant was sentenced to terms of imprisonment below the statutory range for the offense of attempt first degree murder and home invasion. Defendant was found guilty of first degree murder, and the sentencing range for this offense is 20 to 60 years imprisonment. 730 ILCS 5/5-4/5-20(a) (West 2020). There was no firearm enhancement for this

offense.[4] Defendant was also found guilty of attempt first degree murder and home invasion with the additional element that "during the commission of the offense personally discharge[d] a firearm." The sentencing range for attempt first degree murder and home invasion is normally 6 to 30 years as both are Class X offenses. 720 ILCS 5/8-4(c)(1) (eff. Jan. 1, 2010); 720 ILCS 5/12-11(c) (subsequently renumbered as 720 ILCS 5/19-6(c) (eff. Jan. 1, 2013). However, for both offenses, the sentencing provisions require "20 years shall be added to the term of imprisonment imposed by the court" if the jury finds the defendant guilty with this additional element. 720 ILCS 5/8-4(c)(1)(C); 720 ILCS 5/12-11(c).

¶ 99    During the sentencing hearing, the trial court and the parties discussed the sentencing ranges for all the offenses. The State argued that the sentencing range for attempt first degree murder and home invasion, both Class X offenses, was normally 6 to 30 years' imprisonment, however, in this case, the sentencing range was 26 to 50 years because the jury also found that defendant had personally discharged a firearm during the course of both offenses. Defense counsel argued that the jury found defendant guilty of being "armed with a firearm, though, I believe it would be 21 and not 25." At that point, the trial court stated, "I thought it said 21."

¶ 100    The trial court subsequently sentenced defendant to 25 years' imprisonment for each offense without any further comment about the appropriate sentencing range. However, it is clear from a thorough review of the record that the trial court erred in sentencing defendant to a term of imprisonment for these two offenses that was below the proper sentencing range of 26 to 50 years.

¶ 101    In addressing the non-conformity of defendant's sentences for these two offenses, we recognize that, in *Castleberry*, our supreme court abolished the void sentencing rule, which

---

[4] Last minute revisions to the jury instructions resulted in the accidental omission of the 20-year "personal discharge of a firearm" sentencing enhancement from the first degree murder instructions.

declared void any sentence that did not conform to statutory requirements. *Castleberry*, 2015 IL 116916, ¶ 1. A void judgment is entered by a court lacking jurisdiction and may be attacked directly or indirectly at any time; a voidable judgment is erroneously entered by a court having jurisdiction and is not subject to collateral attack. *Id*. ¶ 11. After *Castleberry*, a sentence that does not conform to statutory requirements is voidable, not void. *People v. Price*, 2016 IL 118613, ¶ 17. Thus, "a reviewing court may no longer, *sua sponte*, correct a statutorily nonconforming sentence, the State may no longer seek to correct such a sentence on direct review but must seek a writ of *mandamus* to do so, and a defendant may no longer rely on the void sentence rule to overcome forfeiture of a claimed sentencing error or to challenge a statutorily nonconforming sentence in perpetuity. (Internal citations omitted) *Price*, 2016 IL 118613, ¶ 17.

¶ 102    Applying *Castleberry*, defendant's statutorily nonconforming sentences for the offenses of attempt first degree murder and home invasion is voidable, not void. *Castleberry*, 2015 IL 116916, ¶ 11. Since voidable sentences are not subject to collateral attack, we lack jurisdiction to vacate defendant's sentences. The record does not show that the State has filed a writ of *mandamus* to correct this sentencing error. Therefore, we proceed to address the issues raised in this appeal.

¶ 103        **A. Consideration of an Improper Factor During the Sentencing Hearing**

¶ 104    Defendant contends that the trial court considered an improper aggravating factor at sentencing. Specifically, he asserts that the trial court's comments show that it improperly considered Wilson's conduct in committing "matricide" in the killing of the codefendant's mother.

¶ 105    Initially, defendant concedes that he forfeited his claims by failing to contemporaneously object or include it in his postsentencing motion. See *People v. Hillier*, 237 Ill.2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Nevertheless, as defendant

observes, we may review forfeited sentencing issues under the plain-error rule. To show plain error in the sentencing context, the defendant must establish that a "clear or obvious error occurred" at sentencing and "either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill.2d 539, 545 (2010). Defendant argues that plain-error review is proper under either prong.

¶ 106    Defendant bears the burden of establishing plain error under either prong of the plain-error rule. *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 34. As is true in every case involving plain-error review, we first consider whether error arose at all, because in the absence of error there can be no plain error. *Id.* If we find error, we consider whether either of the two prongs of the plain-error rule has been satisfied. *Id.* Whether plain error arose is a question of law that we review *de novo*. *People v. Johnson*, 238 Ill.2d 478, 485 (2010).

¶ 107    When we consider the propriety of the sentencing hearing, the trial court has discretionary powers in imposing a sentence and the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill.2d 203, 209 (2000). Judges fashion a sentence by considering aggravating and mitigating factors, such as the nature of the circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. The Illinois Constitution requires such a sentence to be balanced between the seriousness of the offense and the defendant's rehabilitative potential. *People v. Lee*, 379 Ill.App.3d 533, 539 (1st Dist. 2008) (citing Ill. Const. 1970, art. 1, § 11). The seriousness of the offense or the need to protect the public, however, may outweigh any mitigating factors and the goal of rehabilitation. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 34.   Indeed, "a defendant's potential for

rehabilitation is but one factor for a sentencing court to consider, and it must be weighed against other countervailing factors, including the seriousness of the crime." *People v. Evans*, 373 Ill.App.3d 948, 968 (1st Dist. 2007). This Court has found, "[t]he most important factor a court considers when deciding a sentence is the seriousness of the offense…Rehabilitative potential, therefore, is not accorded more weight than any other factor." *Evans*, 373 Ill.App.3d at 968.

¶ 108    In the absence of explicit evidence that the sentencing court did not consider mitigating factors, we presume that the sentencing court considered mitigation evidence presented to it. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 41. Absent an abuse of discretion by the trial court, the sentence may not be altered on review. *Stacey*, 193 Ill.2d at 209-210. A reviewing court should not discount or alter the judgment of the trial court simply because it would weigh those factors differently. *People v. Alexander*, 239 Ill.2d 205, 212 (2010); *Stacey*, 193 Ill.2d at 209.

¶ 109    To determine whether the trial court relied on an improper factor in imposing sentence, the reviewing court "will not focus on isolated statements but instead will consider the entire record." *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30. Although the trial court is allowed to make reasonable inferences from the evidence at trial (*People v. Robinson*, 2014 IL App (1st) 130837, ¶ 92), it may not rely on mere speculation. *People v. Zapata*, 347 Ill.App.3d 956, 964 (1st Dist. 2004). "A cause must be remanded for resentencing only where the reviewing court is unable to determine the weight given to an improperly considered factor." *People v. Beals*, 162 Ill.2d 497, 509 (1994). On review to determine whether insignificant weight was given to an improper factor, we consider: "(1) whether the trial court made any dismissive or emphatic comments in reciting its consideration of the improper factor; and (2) whether the sentence received was substantially less than the maximum sentence permissible by statute." *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 18. The trial court's consideration of an improper factor is an abuse of discretion (*People*

*v. Minter*, 2015 IL App (1st) 120958, ¶ 147), but whether the court considered an improper factor is a question of law reviewed *de novo. People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 110    After reviewing the record as a whole, we find that the trial court did not rely upon an improper sentencing factor. Rather, the record shows that the court's allegedly improper remarks were made in the context of referring each of the defendants' conduct separately. The trial court conducted a joint sentencing hearing in which it heard evidence and argument relating to both defendants. The trial court allowed the State to argue which aggravating factors applied to each of the defendants, and did the same for each defense counsel as to the mitigating factors. The State argued that defendant's conduct caused serious harm for the attempt first degree murder conviction, defendant received compensation for the offense, and would be necessary to deter others from committing the crime. Defense counsel argued that he was merely a "puppet" for Wilson, was 20 years old when he committed this offense, he grew up in the Robert Taylor Homes, he did not grow up with his father and was physically abusive to defendant when he was present, he grew up poor, he had poor grades in school, and had no prior criminal history.

¶ 111    The trial court stated that he had read the pre-sentence investigation report "two or three times already as to both [defendants]." The trial court rejected defendant's argument that he was a puppet for Wilson, finding that "Nobody forced him to follow [Wilson] at all. We'll get to Wilson shortly." The trial court commented that "…it's hard to say which one is worse, Wilson or Spencer. Equally as bad. That's more like it. Equally as bad. There's a word I think that describes the case at least as far as [Wilson] is concerned, the word is matricide meaning murder one's own mother…" The trial court went on to comment about the actions of Wilson.

¶ 112    Then, the trial court moved on to address defendant. The trial court found:

"Spencer - - I've read the PSI. Maybe he had some difficulty. He's basically an orphan. His mother and father are both deceased now so he's sort of an orphan. I guess you can say that. He didn't come up as good as some other guys might have come up. You don't have to be a road [sic] scholar to know you can't kill somebody for money or any other reason for that matter. According to the statement I recall vaguely at the moment, I'll give you $4,000 to knock off my mother Yolanda Holmes. He never got that money but he murdered her anyway. To be actually sure that Spencer did kill her, he stabbed her a few times after that as well to make sure she was dead…"

¶ 113    While defendant contends that the trial court improperly attributed the actions of Wilson to defendant, the record does not support this claim. The trial court's references to "matricide" were specifically directed towards the actions of Wilson. Moreover, because the sentencing hearing was held simultaneously for both defendants, and they acted together in committing the offenses, it was likely that the comments made by the trial court in discussing the facts of the case would involve some overlap between them. Instead, the trial court stated that it took into consideration that defendant committed these offenses with the promise of being paid $4,000, and that he shot Holmes before stabbing her in the abdomen to make sure that she was dead. None of the trial court's comments show that it considered an improper factor in fashioning an appropriate sentence for defendant. Because we find that there was no error, there was no plain error to allow defendant to circumvent his forfeiture of this issue.

¶ 114                    **B. Displayed Animosity towards Defendant**

¶ 115    Defendant contends that the trial court displayed "animosity" towards him when it endorsed "brutal and unlawful treatment by prison staff and sexual violence at the hands of other inmates"

if he should masturbate in front of others while incarcerated in the Illinois Department of Corrections. Moreover, defendant contends that the trial court's comments about defendant's misconduct while incarcerated at Cook County Jail showed that the trial court was "allowing vengeance to drive its sentencing decisions." Acknowledging that he failed to preserve this contention for appellate review, he seeks for us to find that this constituted plain error.

¶ 116     In turn, the State contends that, taking the comment in its context, the trial court's comment does not show that the trial court was acting out of vengeance or that the trial court expressed a desire for defendant to be victimized in the future. The State contends that, instead, the comment "was nothing more than a warning to defendant that his sexual misbehavior in the jail must not continued when he gets to prison."

¶ 117     Considering the record as a whole, we agree with the State's assessment of the trial court's comments. At the sentencing hearing, the State introduced testimony that defendant had 36 disciplinary infractions, including 14 infractions for public masturbation. At the time of sentencing, defendant was facing three different criminal cases for masturbating in front of a nurse and two different assistant public defenders. Defendant was also facing two criminal cases for battery to jail staff. In its remarks, the trial court stated, in pertinent part:

"…I can't imagine when a person gets down to DOC he's down there in his cell in DOC messing with the guards like in the County, perhaps. When you're in the penitentiary the guards, who they call the man, you don't mess with the guards in DOC. You may get a little time taken off your sentence or time added to it or isolation or something. Maybe that will happen. I don't know. Maybe you'll masturbate to the guys in the penitentiary. That's sort of like a sexual overtone. Maybe they'll take them up on it. Who knows…"

¶ 118    These comments by the trial court show that it was informing defendant that he could potentially face punishment should he engage in the same type of misconduct while incarcerated at the Illinois Department of Corrections. In making these comments, the trial court was not acting out of vengeance. The trial court never suggested that it was seeking to correct a wrong perpetrated by defendant against the trial court. It never suggested or endorsed that defendant's conduct warranted "brutal and unlawful treatment" by the prison guards or sexual violence at the hands of the other inmates. We also point out that the trial court subsequently explained, when addressing the offenses for which defendant and Wilson were convicted of: "Let me make clear my actual thoughts about [Wilson] and [Spencer]. I have no feelings about these fellows one way or the other. I don't like them or dislike them. Nothing at all. Nothing personal between me and them. I just don't like what they did however. It's not personal at all." Thus, because defendant cannot establish that his trial court committed error, he cannot establish plain error in order to circumvent his forfeiture.

¶ 119                    **C. Applicability of Juvenile Offender Sentencing Provision**

¶ 120    Defendant contends that in sentencing defendant, who was 20 years old at the time that he committed this offense, to a term of 100 years' imprisonment, the trial court erred in failing to consider the sentencing provisions of 730 ILCS 5/5-4.5-105 of the Illinois Code of Corrections. (730 ILCS 5/5-4.5-105 (West 2018)). These provisions require a sentencing court to consider additional mitigating factors when the defendant is under 18 years of age at the time of the commission of the offense. *Id.* He argues that caselaw has found that a 20-year-old defendant should be afforded the juvenile protections articulated in *Miller*. He also argues that his sentence was excessive where it violated the Illinois proportionate penalties clause as applied to him. He asks to have us either reduce defendant's sentence under Illinois Supreme Court Rule 615(b)(4)

(Ill.Sup.Ct.R. 615(b)(4) (eff. Jan. 1, 1967), or remand for re-sentencing before a different judge. In turn, the State contends that the caselaw cited by defendant does not provide for the expansion of the application of these additional sentencing factors for defendant. The State also argues the trial court exercised appropriate discretion at the sentencing hearing where it considered all the appropriate factors, including defendant's age, background and unstable childhood, applicable to him as an adult offender.

¶ 121     At the sentencing hearing, defense counsel asked the trial court to consider the protections pursuant to section 5-4.5-105, even though he was 20 years old and not a juvenile at the time of the offense. While recognizing that the statute only applied to juveniles, he sought to preserve this issue because he argued that courts have extended these types of *Miller* protections to emerging adults, citing to *People v. Buffer*, 2019 IL 122327, and *People v. House*, 2019 IL App (1st) 110580-B. Defense counsel also acknowledged that defendant would be eligible for parole in 20 years under the new statutory sentencing provisions. The trial court agreed with the State's argument that this sentencing statute was inapplicable because defendant was not a juvenile when he committed the offense, finding that there was no caselaw requiring to him consider these factors to an adult offender.

¶ 122     At the outset, it is important to recognize that neither party addresses, in general, the statutory scheme applicable to defendant at the time of the sentencing hearing and, specifically, whether the language of section 5-4.5-105(a) provides support for defendant's contention that the trial court erred in failing to consider its application. The standard of review for whether the trial court properly applied the section 5-4.5-105(a) factors is *de novo*. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26 (citing *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65).

¶ 123    In construing the meaning of a statute, "'the primary objective of this court is to ascertain and give effect to the intention of the legislature, and all other rules of statutory construction are subordinated to this cardinal principle.'" *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 151 (quoting *Metzger v. DaRosa*, 209 Ill.2d 30, 34 (2004)). Consequently, "'[t]he plain language of the statute is the best indicator of the legislature's intent'" and [w]hen the statute's language is clear, it will be given effect without resort to other aids of statutory construction.'" *Id.* ¶ 151 (quoting *Metzger*, 209 Ill.2d at 34-35).

¶ 124    Initially, we find that this statute was in effect at the time of defendant's sentencing hearing. Defendant's sentencing hearing was held on January 31, 2020. Effective January 1, 2016, pursuant to the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 469 (2012), the Illinois legislature enacted Public Act 99-69, adding section 5-4.5-105 to the Unified Code of Corrections. Pub. Act. 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). "This statute provides a new sentencing scheme for defendants under the age of 18 when they committed their offenses." *People v. Buffer*, 2019 IL 122327, ¶ 36.

¶ 125    Section 5-4.5-105(a) provides, in pertinent part:

(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence…"

¶ 126    Those factors to be considered are defendant's "age, impetuosity, and level of maturity at the time of the offense"; whether defendant "was subjected to outside pressure, including peer pressure, familial pressure, or negative influences"; and defendant's home environment, his

rehabilitation potential, as well as the circumstances of the offense. 730 ILCS 5/5-4.5-105(a)(1)(5) (West 2016). In addition, section 5-4.5-105(b) provides:

> "Except as provided in subsection (c), the court may sentence the defendant to any disposition authorized for the class of the offense of which he or she was found guilty as described in Article 4/5 of this Code, and may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession, possession with personal discharge, or possession with personal discharge that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person." 730 ILCS 5/5-4.5-105(b) (West 2016).

¶ 127　　Thus, this statute was in effect at the time of defendant's sentencing hearing, held on January 31, 2020.

¶ 128　　Having found that this statute was in effect, we also find that the trial court did not err in failing to consider these additional mitigating factors where the statute did not apply to defendant under the facts in this case. This statute only applies to individuals who committed the offense when they under the age of 18 years old, but defendant was 20 years old at the time he committed this offense. Moreover, this statute only applies to an offense committed on or after January 1, 2016, and he committed this offense on September 3, 2013, before the effective date of this statute.

¶ 129　　The statute specifically provides that it exclusively applies to a "person is under 18 years of age at the time of the commission of the offense…" *Id*. In fact, in *Buffer*, our Supreme Court recognized that section 5-4.5-105(a) "does not apply to individuals age 18 or older; rather, those individuals are considered adults under the statute." *People v. White*, 2020 IL App (5th) 170345, ¶ 19 (citing *Buffer*, 2019 IL 122327, ¶ 36). Therefore, while this statute was in effect at the time

of defendant's sentencing hearing, it did not apply to defendant because defendant was above the age of 18 years at the time that he committed the offense.

¶ 130     Not only did this statute not apply because defendant was 18 years old or older at the time of the offense, but it did not apply because this offense was not committed before the effective date that this section went into effect. Specifically, this statute provides that "[o]n or after the effective date *** when a person commits an offense." 730 ILCS 5/5-4.5-105(a) (West 2016). "Thus, the plain language of the section shows that it applies only to offenses committed on or after the effective date, which was January 1, 2016." *Gunn*, 2020 IL App (1st) 170542, ¶ 153 (statute did not apply at the defendant's sentencing hearing because the offense was committed on September 20, 2013) (citing *People v. Hunter*, 2017 IL 121306, ¶ 46); see also *People v. Clark*, 2021 IL App (1st) 180523-U (statute did not apply at the defendant's sentencing hearing because the offense was committed on July 19, 2013).

¶ 131     However, while section 5-4.5-105(a) did not apply to the relevant facts in this case, we also recognize that, at the time of defendant's sentencing hearing, because he fell within the age range of 18 and 21 at the time of the offense, he will be eligible for parole review by the Prison Review Board after serving 20 years or more of his sentence. See 730 ILCS 5/5-4.5-115 (West 2019). Effective June 1, 2019, the Illinois General Assembly passed Public Act 100-1182, which established a parole review for persons under the age of 21 at the time of the commission of the offense in section 5/4.5-110 of the Unified Code of Corrections. Pub. Act 100-1182 (eff. June 1, 2019) (amending 730 ILCS 5/5-4.5-110). Under this new statute, a person under 21 years of age at the time of the commission of first degree murder and who is sentenced on or after the effective date of the act shall be eligible for parole review after serving 20 or more years of his or her sentence, excluding those subject to a sentence of natural life. 730 ILCS 5/5-4.5-115(b).

¶ 132    Here, defendant's sentencing hearing occurred on January 31, 2020, which was after the effective date of this provision of June 1, 2019. Thus, as defense counsel recognized at the sentencing hearing, defendant would be eligible for parole review after serving 20 years of his sentence. In *People v. Gomez*, 2020 IL App (1st) 173016, another division of this court recognized:

> "The Code also makes an important distinction between juvenile defendants and young adult defendants on the issue of sentencing. While the sentencing court must consider additional mitigating factors in determining the appropriate sentence for a juvenile defendant, incorporating *Miller* (see 730 ILCS 5/5-4.5-105(a) (West 2016)), there is no corresponding requirement for sentencing young adult defendants under 21 years of age, even to a term of life in prison with no possibility of parole. Section 5-4.5-115 recognizes that young adults under the age of 21 may be less morally culpable than a fully mature adult, thus entitling them to parole review after serving 20 years of a lengthy sentence. However, nothing in the Code equates young adult defendants with juveniles when it comes to sentencing them on their convictions." *Id.* ¶ 33.

¶ 133    Therefore, we find that the trial court did not err in deciding to not consider the mitigating factors outlined in section 5-4.5-105(a) at defendant's sentencing hearing.

¶ 134    **D. Defendant's Constitutional Challenge to his Sentence**

¶ 135    Defendant also argues that the *de facto* sentence he ultimately received violated the Illinois Proportionate Penalties Clause. However, we find that defendant cannot establish that his 100-year sentence of imprisonment violated the Illinois Proportionate Penalties Clause where, as a 20-year-old at the time that he committed this offense, he is eligible for parole review after serving 20 years. 730 ILCS 5/5-4.5-115(b) (West 2020). Thus, because he has a meaningful opportunity to

obtain release before serving more than 40 years' imprisonment, he was not sentenced to a *de facto* life sentence and his sentence did not violate proportionate penalties clause.

¶ 136    Defendant's sentencing challenge is based upon *Miller v. Alabama*, 567 U.S. 460 (2012), in which the United States Supreme Court held that the prohibition on cruel or unusual punishment in the eighth amendment of the United States Constitution (U.S. Const., amend VIII) forbids mandatory life sentences without the possibility of parole for "those under the age of 18 at the time of their crimes." *Miller*, 567 U.S. at 465, 479. Our supreme court has subsequently held that, where an offender is younger than 18 years old, the trial court must consider certain factors before imposing a life sentence, including: his age and evidence of his "particular immaturity"; his family and home environment; his degree of participation in the homicide and any familiar or peer pressure; his incompetence; and his rehabilitative potential. *People v. Savage*, 2020 IL App (1st) 173135, ¶ 58 (citing *People v. Holman*, 2017 IL 120655, ¶ 46). *Miller* applies retroactively to cases on collateral review. *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016).

¶ 137    The Illinois Supreme Court subsequently concluded that *Miller* applied to *de facto* life sentences. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10. In *People v. Buffer*, 2019 IL 122327, our supreme court defined a *de facto* life sentence for a juvenile as a sentence of more than 40 years' imprisonment. *Id.* ¶ 41. Here, defendant argues that his 100-year sentence constituted a *de facto* life sentence.

¶ 138    Defendant exclusively raises this claim as a violation of Illinois' proportionate penalties clause as "Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment." *People v. Savage*, 2020 IL App (1st) 173135, ¶ 61 (citing *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38). This is because federal

cases have generally drawn a line at 18 years of age and because the Illinois clause offers a broader path to the same type of relief. *Savage*, 2020 IL App (1st) 173135, ¶ 61.

¶ 139     The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the defendant to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has held that the "limitation on penalties" in this clause "goes beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v. Clemons*, 2012 IL 107821, ¶ 40. For a defendant to succeed in a proportionate penalty claim, he must first demonstrate that the penalty is degrading, cruel or "so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill.2d 337, 348-49 (2009).

¶ 140     Defendant is correct that this court has not foreclosed youthful offenders between 18 and 19 years old from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development. *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (19-year-old defendant sentenced to a term of natural life in prison); *People v. Harris*, 2018 IL 121932, ¶¶1, 48 (18-year-old defendant sentenced to 76 years' imprisonment). Thus, a defendant raising a claim under the proportionate penalties clause must show that he (1) was under 21 years of age at the time of the offense, and (2) received a mandatory natural or *de facto* life prison sentence. *People v. Clark*, 2023 IL 127273, ¶¶ 72-73; *People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 25.

¶ 141     Here, the trial court sentenced defendant to 100 years in prison on January 31, 2020. The statutory minimum in this case was 72 years' imprisonment: consecutive sentences of 20 years for first degree murder (See 730 ILCS 5/5-4.5-20 (West 2010) (providing a range of 20 to 60 years imprisonment for first degree murder); 26 years for attempt first degree murder during which he

personally discharging a firearm (See 720 ILCS 5/8-4(c)); and 26 years for home invasion during which he personally discharges a firearm (720 ILCS 5/12-11(a)(4)).[5] Because the trial court was required to sentence defendant to a term of imprisonment of more than 40 years, defendant's sentence would have constituted a mandatory *de facto* life sentence under *Miller* if it had been imposed prior to June 1, 2019. *People v. Clark*, 2023 IL 127273, ¶ 72.

¶ 142    However, on that date, section 5/5-4.5-115(b) of the Illinois Code of Corrections went into effect, creating parole review for offenders under the age of 21 at the time of the offense. 730 ILCS 5/5-4.5-115(b) (West 2020). "This legislation was enacted in response to emerging case law to address 'youthful offenders under the age of 21.'" *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 37 (quoting *People v. Green*, 2022 IL App (1st) 200749, ¶ 41). As previously outlined, under this statute, a person convicted of first degree murder is eligible for parole after serving 20 years if he or she is under 21 years old at the time of the offense and when sentenced after the law took effect. *Id.* The statute requires that the Prisoner Review Board panel must "consider the diminished capacity of youthful offenders, the hallmark of features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." *Id*. 5-4.5-115(j). Here, defendant was sentenced after this date and he was under the age of 21 at the time of the offense, so he will be eligible for parole review after serving 20 years of his prison term.

¶ 143    Recently, in *People v. Kendrick*, 2023 IL App (3d) 200127, the court held that the defendant could not establish that he had been sentenced to a *de facto* life sentence where he had a meaningful opportunity to obtain release before serving more than 40 years' imprisonment. *Id*. ¶ 43 (citing

---

[5] As previously noted, last minutes revisions to the jury instructions resulted in the accidental omission of the 20-year "personal discharge of a firearm" sentencing enhancement from the first degree murder instructions. Moreover, defendant was sentenced to consecutive terms of 25 years' imprisonment for attempt first degree murder and home invasion, however, the proper sentencing range for these offenses was 26 to 50 years.

*People v. Thompson*, 2022 IL App (1st) 200463, ¶¶ 44-47; *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 34-38)). The court recognized that, "[i]n assessing whether a *de facto* life sentence has been imposed, the court must consider the defendant's 'earliest opportunity for release.'" *Kendrick*, 2023 IL App (3d) 200127, ¶ 42 (quoting *People v. Dorsey*, 2021 IL 123010, ¶ 54; citing *People v. Reyes*, 2016 IL 119271, ¶ 10). When section 5-4.5-115(b) applies, the defendant's sentence is "not a *de facto* life sentence since [the defendant] is eligible for parole." *Id.* (quoting *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56 (70 year sentence of imprisonment for 20-year-old was not *de facto* sentence where defendant was eligible for parole after 20 years). Because defendant did not receive a *de facto* life sentence, he cannot establish that his sentence violated the proportionate penalties clause. For these reasons, defendant's as-applied constitutional challenge based on *Miller* necessarily fails.

¶ 144                                   CONCLUSION

¶ 145      For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 146  Affirmed.

¶ 147  JUSTICE COGHLAN, specially concurring:

¶ 148      Relying on the reasoning of a divided panel of this court in *People v. Bass*, 2019 IL App (1st) 160646, *aff'd in part, vacated in part*, 2021 IL 123434, and *People v. Smith*, 2022 IL App (1st) 190691, the majority concludes that "the arrest of defendant in this case, pursuant only to an investigative alert, violated the search-and-seizure clause of the Illinois Constitution, even if the alert was based on probable cause." *Supra* ¶ 88. Although I agree that defendant's conviction should be affirmed, I disagree that it is necessary to comment on the constitutionality of investigative alerts to reach that decision. Since the majority acknowledges that "the police in this case acted in objectively reasonable, good-faith reliance upon the legal landscape that

existed at the time of defendant's arrest" (*supra* ¶ 94), there is no need to discuss "whether the holding in *Smith*, [echoing] the *Bass* majority's now-vacated holding, was correctly decided" (*People v. Erwin*, 2023 IL App (1st) 200936, ¶ 47).

¶ 149 For the foregoing reasons, I concur in the judgment but do not join in the majority's analysis on investigative alerts.

¶ 150 JUSTICE HYMAN, concurring in part and dissenting in part:

¶ 151 Spencer and the majority rightly insist that the proportionate penalties clause offers a "broader path" for emerging adults raising as-applied challenges to their life sentences. *Supra* ¶¶ 138, 141. But both make fundamental errors from there.

¶ 152 Spencer asks us to reach the merits of his claim too soon, having not shown he is entitled to *Miller*'s protections under our constitution. The majority obliges his premature request but to bar emerging adults like him from ever litigating these claims. Because Spencer may not bring his claim in this direct appeal, I concur in part. But because the majority prevents him from bringing it in postconviction proceedings, I also dissent.

¶ 153 Applying People v. Harris

¶ 154 The supreme court left room for claims like Spencer's but provided no guidance on how to litigate them. In *People v. Harris*, 2018 IL 121932, the court appeared to envision a factual inquiry yet declined to consider the claim on direct appeal. The court reasoned that the record included "only basic information about [the] defendant, primarily from the presentence investigation report," and there had been no evidentiary hearing and no findings "on the critical facts needed to determine whether *Miller* applie[d] to [the] defendant as an adult." *Id.* ¶ 46.

¶ 155 Nearly five years have intervened since *Harris*, and the courts and the litigants still have little guidance. See *People v. Clark*, 2023 IL 127273, ¶ 87 (noting again, claims may be brought).

Given this void, appellate panels have done their best to envision how the theory in *Harris* should work in practice. See *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 33 (petitioner may make "showing that his mental health conditions are of a nature that he can and will outgrow them and that he was the functional equivalent of a juvenile because of those conditions"); *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 52 (reading *Harris* as providing three-step process when emerging adults litigate in postconviction proceedings). But decisions like these were unavailable before Spencer's sentencing.

¶ 156　　The record before us contains basic information of the type *Harris* found lacking. The trial court had the presentence investigation report, testimony from witnesses in aggravation, victim-impact statements, and a brief statement from Spencer in allocution. Counsel for Spencer presented no witnesses in mitigation. Nevertheless, even had counsel presented witnesses, the trial court likely would not have made the necessary findings, whatever they may be. The trial court asserted that *Harris* did not apply and declined to hold a separate hearing when requested by counsel for co-defendant.

¶ 157　　Though Spencer contends that he correctly raised this claim before the trial court, the record suggests otherwise. See *Ruiz*, 2020 IL App (1st) 163145, ¶ 52 (emerging adults not entitled to presumption *Miller* applies). And although the trial court erred by asserting that *Harris* did not apply, it also lacked meaningful guidance on how to apply *Harris*. As a result, I would find that Spencer must raise this claim in postconviction proceedings as directed in *Harris*, 2018 IL 121932, ¶ 48.

¶ 158　　　　　　　　　　　　　　The Nature of Spencer's Claim

¶ 159　　As-applied challenges like Spencer's are vital under our state constitutional order. They ensure the constitutionality of specific sentences without undermining the more general power of

the legislature to craft the parameters of our sentencing laws. *People v. Leon Miller*, 202 Ill. 2d 328, 336-40 (2002). But the General Assembly's constitutional duty in this context does not justify the judiciary refusing to review the constitutionality of sentences. The majority does just that for two mistaken reasons.

¶ 160     First, the majority misconstrues Spencer's claim as an entitlement to a sentencing hearing compliant with a specific sentencing statute, 730 ILCS 5/5-4.5-105 (West 2016). The majority concludes this statute, which codified the *Miller* factors under state law (*see People v. Holman*, 2017 IL 120655, ¶ 45), does not apply because Spencer was older than 18 when he committed the offenses and because the offenses were committed before that statute came into effect. *Supra* ¶¶ 119-133. Both observations are beside the point. As an emerging adult, Spencer needed to make a threshold showing that his individual characteristics demanded *Miller*'s application under the Illinois constitution. See *Ruiz*, 2020 IL App (1st) 163145, ¶ 52 (emerging adults not entitled to presumption *Miller* applies). Section 5-4.5-105 is not yet relevant.

¶ 161     Second, and more troublingly, the majority finds that the general assembly has excluded emerging adults from raising as-applied challenges to their life sentences under the proportionate penalties clause. *Supra* ¶¶ 140-143 (discussing 730 ILCS 5/5-4.5-115(b) (West 2020)). The majority hastily agrees with other appellate decisions that, with access to parole review under section 5-4.5-115, emerging adults like Spencer can no longer show they received life sentences triggering *Miller*'s protections. See, *e.g.*, *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 43; *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56.

¶ 162     The majority errs by analyzing this issue as if the proportionate penalties clause and the eighth amendment are identical. *Supra* ¶ 143. They are not. *People v. Clemons*, 2012 IL 107821, ¶ 40. As our supreme court has explained, "[T]he limitation on penalties set forth in the second

clause of article I, section 11, which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *Clemons*, 2012 IL 107821, ¶ 40.

¶ 163    With the goal of rehabilitation in mind, one sees that the majority (and the cases on which it relies) has joined an emerging line of cases paring back the eighth amendment's substantive guarantees. Consider *People v. Dorsey*, 2021 IL 123010, ¶¶ 64-66, where the supreme court focused its analysis on the eighth amendment in the wake of the United States Supreme Court's decision in *Jones v. Mississippi*, 141 S. Ct. 1307, 1319 (2021). In holding that good-conduct credit applies to what constitutes a *de facto* life sentence under the eighth amendment (*Dorsey*, 2021 IL 123010, ¶ 1), *Dorsey* distinguished discretionary parole as offering no more than a mere hope. *Id.* ¶ 56 (discussing *Greenholtz v. Inmates of the Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7-8 (1979) ("no constitutional guarantee that [parole] must comply with standards that assure error-free determinations")).

¶ 164    Thus, *Dorsey* offers no reason to conclude that the existence of a discretionary parole system controls whether an emerging adult may raise an as-applied challenge to their life sentence under the proportionate penalties clause. *See People v. Carrasquillo*, 2023 IL App (1st) 211241, ¶¶ 43-47 (finding *Dorsey* not applicable). On the contrary, *Dorsey* offers a reason to doubt that would be true. *Clemons*, 2012 IL 107821, ¶ 40. Likewise, section 5-4.5-115 disclaims any pretense toward precluding judicial review of emerging adult's as-applied challenges under our constitution. 730 ILCS 5/5-4.5-115(*o*) ("Nothing in this Section shall be construed as a limit, substitution, or bar on a person's right to sentencing relief, or any other manner of relief, obtained by order of a court in proceedings other than as provided in this Section.") Simply put,

neither *Dorsey* nor section 5-4.5-115 preclude Illinois courts from considering Spencer's claim once properly asserted.

¶ 165     Emerging adults raising as-applied challenges under the proportionate penalties clause must demonstrate "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Leon Miller*, 202 Ill. 2d at 338. Illinois cases have not defined cruel, degrading, or shockingly disproportionate punishment "because, as our society evolves, so too do our concepts of elemental decency and fairness which shape the moral sense of the community." (Internal quotation omitted.) *Id.* at 339.

¶ 166     Consistent with this observation, we must hear claims like Spencer's and never abdicate our duty to review "the gravity of [a person's] offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340. "[R]ather than 'blindly follow the reasoning of a United States Supreme Court decision at all costs,' [Illinois courts] should rely on [their] own case law, wisdom and reason to construe our state constitutional provisions." *People v. Lindsey*, 199 Ill. 2d 460, 467-68 (2002) (quoting, *People v. McCauley*, 163 Ill. 2d 414, 439 (1994)).

¶ 167     "Law should be like clothes," said Clarence Darrow, the legendary Chicago defense lawyer. Laws "should be made to fit the people they are meant to serve." As-applied challenges do just that. The majority, however, has joined a dangerous line of cases tailored to bolt the courthouse to as-applied challenges. So I dissent.